Ilyaas GILBERT, et al., Appellants,

v.

Menachem MIODOVNIK,
et al., Appellees.

No. 07–CV–315.

District of Columbia Court of Appeals.

Argued Sept. 17, 2008.

Decided March 18, 2010.

Wayne M. Willoughby, with whom Zev T. Gershon and Robin R. Smith, Owings Mills, MD, were on the brief, for appellants.

Donald L. DeVries, Jr., with whom Kelly Hughes Iverson and K. Nichole Nesbitt, Baltimore, MD, were on the brief, for appellees.

Susan M. Jenkins and Joanna M. King filed a brief amici curiae for the American College of Nurse–Midwives and the American Association of Birth Centers in support of appellees.

Before RUIZ, FISHER, and THOMPSON, Associate Judges.

FISHER, Associate Judge:

Appellants Saara Abdul–Haqq and Michael Gilbert brought this medical malpractice action on behalf of themselves and their minor son, Ilyaas Gilbert, who suffered severe injuries at the time of his birth. They claim that Dr. Menachem Miodovnik, an employee of the Washington Hospital Center ("WHC"), was negligent

because he did not intervene to alter the treatment plan the District of Columbia Birth Center ("DCBC"), an association of nurse-midwives, had developed for assisting the birth. Dr. Miodovnik, who never met or examined Mrs. Abdul–Haqq, discussed her care with a registered nurse-midwife from the DCBC on one occasion. The trial court held that Dr. Miodovnik did not owe a duty of care to the patient and granted summary judgment in favor of the appellees. We affirm.

## I. Factual Summary

### A. Mrs. Abdul–Haqq's Medical History

In September 2004, acting upon the advice of women at her mosque, Saara Abdul–Haqq sought prenatal care from the District of Columbia Birth Center. Mrs. Abdul–Haqq was pregnant with her third child, she was in normal health at the time, and she understood that all of her prenatal care would be provided by the nurse-midwives at the DCBC.

Mrs. Abdul–Haqq had delivered her two older children via cesarean section, but she wanted to attempt a vaginal birth of her third child. The medical profession refers to this procedure as a vaginal birth after cesarean section ("VBAC"). In the course of the treatment she received from the DCBC, Mrs. Abdul–Haqq was advised of the increased risks that a VBAC posed to herself and her fetus. In October 2004 Mrs. Abdul–Haqq signed a consent form which, among other things, identified tearing of the uterus as a risk associated with a VBAC, and indicated that this risk increased if the patient had had more than one cesarean section.

### B. The Nurse–Midwives at the DCBC

The nurse-midwives of the DCBC provide health care services to women throughout the birth process, whether they deliver their babies at the Birth Center or in a hospital. When the DCBC manages a client's care, but birth center delivery is deemed inappropriate, the nurse-midwives make arrangements for hospital delivery. The DCBC nurse-midwives regularly assist women attempting a VBAC, and when they do so, the delivery occurs at the Washington Hospital Center.

### C. Dr. Miodovnik and the DCBC

Pursuant to a one-page Memorandum of Understanding ("MOU"), Dr. Menachem Miodovnik, the Chief of Obstetrics and Gynecology at Washington Hospital Center Corporation, served as the Director of Medical Affairs of the DCBC. This title is somewhat misleading, however. Under the DCBC Policies and Practice Guidelines, nurse-midwives do not report to the Director of Medical Affairs; they report to the Director of Clinical Services of the DCBC, and the Director of Clinical Services reports to the President and CEO of the DCBC.

As provided in a separate one-page MOU,[1] Dr. Miodovnik also served as a consulting obstetrician for the DCBC. Dr. Miodovnik agreed to interact with the nurse-midwives in various ways that ranged from evaluating patient records to "accept[ing] the transfer and medical management" of patients who developed complications. If a transfer to medical management becomes necessary, DCBC clients have the option of choosing their own physician or using the DCBC's consultant or his designee.

---

1. Because both pages are signed, it is not clear whether Dr. Miodovnik's agreements with the DCBC constitute one two-page MOU or two one-page MOUs. The answer to this question is irrelevant for our purposes.

## D. The Chart Review

On March 21, 2005, Nurse–Midwife Alexander discussed Mrs. Abdul–Haqq's case with Dr. Miodovnik during a routine "chart review" of several patients. According to Dr. Miodovnik, during such routine reviews, he does not actually examine the medical charts of the patients. Instead, the nurse-midwives present the cases and he writes notes.

In this instance, Dr. Miodovnik did not examine Mrs. Abdul–Haqq's chart. Prior to the chart review, Nurse–Midwife Alexander reviewed Mrs. Abdul–Haqq's medical records and recorded pertinent information on a form which she brought to her meeting with Dr. Miodovnik. In addition to sharing the information on the form, Nurse–Midwife Alexander told Dr. Miodovnik that Mrs. Abdul–Haqq "desired a VBAC, that she wanted—very much wanted to have a vaginal birth." According to Nurse–Midwife Alexander, Dr. Miodovnik expressed concern about the increased risks associated with a VBAC after two prior cesarean sections and advised her to reiterate the risks of the procedure to Mrs. Abdul–Haqq. She testified: "I remember that the patient really wanted a VBAC. He [Dr. Miodovnik] really wanted us to be sure to reiterate the risk to the patient and asked if she had been properly consented and that we do so again." Nurse–Midwife Alexander resisted the suggestion that Dr. Miodovnik had "approved a VBAC for this patient.... [H]e was not happy that this patient wanted a VBAC."

Dr. Miodovnik made an entry on the form (later inserted into Mrs. Abdul–Haqq's file) which stated "P @ 35/7 weeks gestation. H/O c/s × 2. Pt. Desires VBAC. Pt. understand [sic] that the risk of VBAC after two cesarean section [sic] is *much* higher for uterine rupture—fetal death and risk for having increased morbidity for herself. Needs prophylactic antibiotics in labor."

## E. Mrs. Abdul–Haqq's Treatment After the Chart Review

According to her deposition testimony, Nurse–Midwife Alexander intended to tell Mrs. Abdul–Haqq—"like Dr. Miodovnik told [her] to do"—that she had a higher risk of uterine rupture than other patients. So far as the evidence discloses, however, after the chart review none of the nurse-midwives reiterated to Mrs. Abdul–Haqq the risks of a VBAC after two prior cesarean sections.

After this "chart review" session, the nurse-midwives did not update Dr. Miodovnik about Mrs. Abdul–Haqq's care, and he did not inquire about her treatment. The doctor never met Mrs. Abdul–Haqq, nor did he ever examine her. Mrs. Abdul–Haqq did not know that a chart review had taken place, and she was not aware of Dr. Miodovnik's existence. Up until the time of her delivery, Mrs. Abdul–Haqq did not know that her treatment had been discussed with anyone other than the nurse-midwives at the DCBC.

## F. Mrs. Abdul–Haqq's Labor and Delivery

On April 26, 2005, Mrs. Abdul–Haqq went to Washington Hospital Center because she thought she was in labor. At that time, she was still under the care of the DCBC nurse-midwives, and a VBAC at the hospital attended by a nurse-midwife was still planned. She was monitored and discharged. That night, Mrs. Abdul–Haqq returned to the hospital and was placed in the care of Nurse–Midwife Mairi Rothman.

Following standard procedure, Nurse–Midwife Rothman notified the backup physician, Virginia Leslie, that one of the DCBC's patients was in labor. Nurse–

Midwife Rothman presented the patient's medical history to Dr. Leslie, who expressed concern about the plan for delivery. As a result of this conversation, Dr. Leslie advised Mrs. Abdul–Haqq of the risks associated with attempting a VBAC and recommended a third cesarean section. Mrs. Abdul–Haqq consented, and the hospital staff began preparing for surgery.

Before the operating room was ready, however, the fetal heart monitor indicated that the baby's heart rate was rising, and then the hospital staff began having trouble detecting the heartbeat. Surgery began, and "[u]pon entry into the abdomen and visualization of the uterus, it was clear" that Mrs. Abdul–Haqq's uterus had ruptured. In the early morning of April 27, 2005, Ilyaas Gilbert was delivered through the rupture in Mrs. Abdul–Haqq's uterus. He sustained brain damage and other severe and permanent injuries.

## II. Procedural Background

On September 21, 2005, appellants filed a complaint accusing the DCBC, Dr. Miodovnik, and WHC of negligence.[2] Dr. Miodovnik and Washington Hospital Center moved for summary judgment, arguing that the plaintiffs' claim of negligence failed because "Dr. Miodovnik owed no duty of care to Saara Abdul–Haqq." Plaintiffs responded, asserting that Dr. Miodovnik "collaborated on developing and approving a treatment plan" that involved an attempt at a VBAC, and that this was a violation of the standard of care.

The Superior Court issued an opinion and order on January 11, 2007, granting the motion of defendants Miodovnik and WHC for summary judgment. After noting that "a review of binding authority on this court has revealed woefully little applicable law to answer the question of when a duty exists between a consulting physician and a patient," the trial court examined the facts of the instant case in light of the decision in *Newborn v. United States,* 238 F.Supp.2d 145 (D.D.C.2002). The court noted, among other factors, that Dr. Miodovnik never met Mrs. Abdul–Haqq; she was unaware of Dr. Miodovnik's existence; "Dr. Miodovnik only considered and commented on plaintiff's medical care on one occasion"; the nurse-midwives were qualified to exercise independent judgment; and Dr. Miodovnik was not paid for the chart review. In light of these factors, the trial court concluded that Dr. Miodovnik's chart review with Nurse–Midwife Alexander "was insufficient to create a duty vis-a-vis plaintiff Abdul–Haqq."

The court noted that its legal conclusion was supported by public policy considerations. Imposing liability on a consulting physician under these circumstances would discourage consultation between health care providers. "Here, the District has seen fit under its regulations to allow nurse-midwives to provide standard primary care for pregnant women, without the aid of a doctor. Encouraging the nurse-midwives to consult with obstetrics professionals is in the public interest. Conversely, extending liability to such consultations, without more, contradicts that interest. The court is unprepared to do this."

The appellants later entered into a settlement with the DCBC. This appeal followed.

## III. Standard of Review

▬ We review orders granting summary judgment *de novo.* *See Williams v.*

---

**2.** Appellants' claims against WHC are based on a theory of vicarious liability. Appellants do not allege independent grounds for liability against WHC.

*District of Columbia,* 902 A.2d 91, 94 (D.C. 2006). When doing so, we independently analyze the record in the light most favorable to the non-moving party, drawing all reasonable inferences from the evidence in the non-moving party's favor.[3] *See generally EastBanc, Inc. v. Georgetown Park Assocs. II, L.P.,* 940 A.2d 996, 1001–02 (D.C.2008); *Nat'l Ass'n of Postmasters of the United States v. Hyatt Regency Washington,* 894 A.2d 471, 474 (D.C.2006). Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Super. Ct. Civ. R. 56(c).

■■■ The party moving for summary judgment bears the initial burden of establishing that there is no genuine issue of material fact, and then the burden shifts to the non-moving party to identify specific facts demonstrating a genuine issue for resolution at trial. *See LaPrade v. Rosinsky,* 882 A.2d 192, 196 (D.C.2005). To satisfy this burden, the non-moving party must show more than a "metaphysical doubt" or a "scintilla of evidence." *Id.* "[T]here must be some significant probative evidence tending to support the complaint so that a reasonable fact-finder could return a verdict for the non-moving party." *Warren v. Medlantic Health Group, Inc.,* 936 A.2d 733, 737 (D.C.2007) (citations and punctuation omitted).

■■■ In order to defeat a properly-supported motion for summary judgment in an action for medical malpractice, the plaintiff must present a *prima facie* case establishing the applicable standard of care, showing that the standard of care has been violated, and demonstrating a causal connection between the violation and the damage suffered. *See Warren v. Medlantic Health,* 936 A.2d at 737; *Derzavis v. Bepko,* 766 A.2d 514, 519 (D.C.2000); *Ferrell v. Rosenbaum,* 691 A.2d 641, 646 (D.C. 1997). Of course, this abbreviated statement of the elements of proof assumes that the defendant owes the plaintiff a duty of care. "The foundation of modern negligence law is the existence of a duty owed by the defendant to the plaintiff. Negligence is a breach of duty; if there is no duty, there can be no breach, and hence no negligence." *N.O.L. v. District of Columbia,* 674 A.2d 498, 499 n. 2 (D.C.1996). *Accord, Youssef v. 3636 Corp.,* 777 A.2d 787, 792 (D.C.2001) ("[A] defendant is liable to a plaintiff for negligence only when the defendant owes the plaintiff some duty of care.").

## IV. Statutes, Regulations, and Professional Standards Governing Midwifery in the District of Columbia

The Council of the District of Columbia has recognized the independence of nurse-

---

**3.** For example, Dr. Miodovnik testified that it was his understanding after the March 21, 2005, chart review, that a nurse-midwife would "instruct" Mrs. Abdul–Haqq to have a repeat cesarean section. He stated that he expected the nurse-midwife to call him or conduct another chart review with him if the patient continued to refuse a cesarean section. Dr. Miodovnik also testified that the practice then would have been to "send the patient to the high risk clinic for further consultation." Appellants challenge the veracity of this testimony. Because Dr. Miodovnik's deposition testimony expands somewhat on Nurse–Midwife Alexander's deposition testimony and the notation on Saara Abdul–Haqq's medical chart, we have omitted this portion of Dr. Miodovnik's testimony from our statement of facts and do not consider it in our analysis. The dissent faults us for ignoring this testimony, see *post,* note 5, but we have done so in order to construe the record in the light most favorable to appellants. Adding this disputed testimony to the mix would not change our analysis.

midwives, and their practice is governed by statutes and regulations. Nurse-midwives are considered to be engaged in advanced practice registered nursing. D.C.Code § 3–1202.04(b)(1) (2001) ("Advanced practice registered nursing includes, but is not limited to, the categories of nurse midwife...."). Advanced practice registered nurses "may perform actions of nursing diagnosis and nursing treatment of alterations of the health status"; they "may also perform actions of medical diagnosis and treatment" if they are "carried out in accordance with the procedures required by this chapter[,]" D.C.Code § 3–1201.02(2) (2001), and they may "[m]ake referrals for appropriate therapies or treatments[.]" D.C.Code § 3–1206.04(3) (2001).[4]

Advanced practice registered nurses may also obtain clinical and admitting privileges at hospitals. "No provision of District of Columbia law, institutional or staff bylaw of a facility or agency, rule or regulation, or practice shall prohibit qualified advanced practice registered nurses, podiatrists, or psychologists from being accorded clinical privileges and appointed to all categories of staff membership at those facilities and agencies that offer the kinds of services that can be performed by either members of these health professions or physicians." D.C.Code § 44–507(c) (2001).

District of Columbia Municipal Regulations elaborate on the role of nurse-midwives and the scope of their practice. A certified nurse-midwife is "a registered nurse trained in an educational program to provide nurse-midwifery services, exercise independent judgment, and assume primary responsibility for the care of patients." 17 DCMR § 5899.1 (2002). "[W]hen functioning within the authorized scope of practice," certified nurse-midwives "are qualified to assume primary responsibility for the care of their patients" through "the use of independent judgment as well as collaborative interaction with physicians or osteopaths." 17 DCMR § 5800.1 (2002). The scope of their practice includes providing primary health care and managing the "care of the normal obstetrical patient," who is defined as "a healthy individual who meets the criteria established in practice protocols as normal." See 17 DCMR § 5808.1(a) and (j) (2002); 17 DCMR § 5808.6 (1989). Nurse-midwives may "[m]anage the normal obstetrical patient during labor and delivery to include amniotomy, episiotomy, and repair," 17 DCMR § 5808.1(c) (2002), but they "may not perform a cesarean section or surgical abortion." 17 DCMR § 5808.5 (1989).

Nurse-midwives play an important role in providing health care. *Amici* inform us that, in 2005, 11.2% of all vaginal births in the United States were attended by nurse-midwives. *See* JOYCE A. MARTIN, ET AL., BIRTHS: FINAL DATA FOR 2005, NATIONAL CENTER FOR HEALTH STATISTICS, VITAL HEALTH STAT SERIES VOL. 56 No. 6, at 18 (2007). Most births attended by nurse-midwives occurred in hospitals. *Id.* The majority of women attended by nurse-midwives live in under-served communities, *see* Jeanne Raisler & Holly Kennedy, *Midwifery Care of Poor and Vulnerable Women: 1925–2003*, 50 J. MIDWIFERY & W.H. 120 (2005), and these women report high levels of satisfaction. *See* AMERICAN COLLEGE OF NURSE-MIDWIVES, MIDWIFERY IN 2007: EVIDENCE-BASED PRACTICE (2007).

## V. The Asserted Duty and Its Potential Bases

■ The trial court held that appellants failed to establish the first element of medical malpractice—that Dr. Miodovnik had a duty to Mrs. Abdul–Haqq. Whether a physician owed a duty to a patient in a

---

**4.** We quote the versions of these statutes in effect at the time of these events.

particular set of circumstances is a question of law to be determined by the court, although the answer depends on the totality of the circumstances in each individual case. *See Childs v. Purll*, 882 A.2d 227, 233 (D.C.2005); *Croce v. Hall*, 657 A.2d 307, 310 (D.C.1995). "The existence of a duty ... results ultimately from policy decisions made by the courts and the legislatures." *Williams v. Baker*, 572 A.2d 1062, 1064 (D.C.1990) (en banc). *See District of Columbia v. Cooper*, 483 A.2d 317, 321 (D.C.1984) (noting that the existence of a duty of care is " 'essentially a question of whether the policy of the law will extend the responsibility for the conduct to the consequences which have in fact occurred' ") (citations omitted). The legislature has not spoken directly to the issue before us now, but its decision to recognize the professional status of nurse-midwives necessarily informs our analysis.

 The issue of whether a consulting physician owes a duty of care to a patient arises in a variety of circumstances. Nevertheless, in resolving this appeal, we do not consider it either necessary or helpful to address broad questions of duty in the abstract. "[A]s a general rule, this court will decide only such questions as are necessary for a determination of the case presented for consideration, and will not render decisions in advance of such necessity." *District of Columbia v. Wical Ltd. P'ship*, 630 A.2d 174, 182 (D.C.1993) (quoting *Johnson v. Morris*, 87 Wash.2d 922, 931, 557 P.2d 1299, 1305 (1976) (en banc)). Rather, we consider whether Dr. Miodovnik had a duty of the type at issue here.[5]

We assume, without deciding, that Dr. Miodovnik had a duty to use reasonable care when conferring with the nurse-midwives from DCBC, and that in some circumstances this duty would extend to the patient. However, there is no evidence that he gave bad advice or failed to identify any material risks of which Nurse–Midwife Alexander was not aware.[6] According to Nurse–Midwife Alexander, Dr. Miodovnik expressed his concern about the wisdom of attempting a VBAC after two prior cesarean sections ("he was not happy that

---

**5.** The questions of duty of care and standard of care are separate inquiries under our case law, but they often overlap. *See Newborn v. United States*, 238 F.Supp.2d 145, 149 (D.D.C. 2002) (observing that the questions of duty of care and standard of care appear "merged— or, perhaps, blurred—into a single question in the District of Columbia"), *aff'd*, 84 Fed.Appx. 97 (D.C.Cir.2003). Our medical malpractice cases may foster this impression because in many of them there was no dispute that the doctor owed a duty of care to his patient. Appellants urge us to hold that Dr. Miodovnik had an undefined duty of care toward Mrs. Abdul–Haqq (or at least that there are enough facts in dispute to preclude summary judgment), then to remand for a trial to identify a standard of care and to determine whether that standard was breached, but we decline to approach our analysis in that fashion. In many cases, especially those involving consultants, if a duty exists at all, it is limited in nature. *See In re Sealed Case*, 314 U.S.App. D.C. 271, 274, 67 F.3d 965, 968 (1995) ("[A]ny duty owed by the defendant Consultant in the circumstances of this case was limited to a careful review of the laboratory records referred to him by Mr. B's primary physician."). The crucial question in this case is whether Dr. Miodovnik had a duty to intervene in the care of Mrs. Abdul–Haqq.

**6.** *Cf. In re Sealed Case*, 314 U.S.App. D.C. 271, 275, 67 F.3d 965, 969 (1995) ("Mrs. B does not allege that Consultant misread the six pages of results he reviewed, nor that he failed to inquire into or diagnose any underlying medical problem that he should have suspected based on those six pages."); *Dodd– Anderson v. Henderson*, 107 F.3d 20, 1997 WL 60743, at *3 (10th Cir.1997) (unpublished) ("Even if Dr. Henderson incurred some duty when he responded to the call of the respiratory therapist, it was only a duty to inform Dr. Stevens of his impressions based on his limited knowledge of the patient. This he did. There is no evidence that he was wrong in this regard.").

this patient wanted a VBAC") and advised her to reiterate the risks to Mrs. Abdul–Haqq. There is no evidence to the contrary.[7]

Appellants argue here that Dr. Miodovnik was negligent because he "failed to order a pre-labor cesarean section for Mrs. Abdul–Haqq and instead signed off on a treatment plan calling for a VBAC." Of course, Dr. Miodovnik could not "order" surgery without the patient's consent. *See In re A.C.,* 573 A.2d 1235 (D.C.1990) (en banc). We understand appellants' argument to mean that Dr. Miodovnik had a duty (1) to override the judgment of the nurse-midwives and alter the plan of treatment, and (2) to communicate with Mrs. Abdul–Haqq directly and counsel her that an attempt at a VBAC was inadvisable.[8]

### A. Was There a Physician–Patient Relationship?

 The undisputed facts demonstrate that Mrs. Abdul–Haqq never met or knew of Dr. Miodovnik. The doctor never examined Mrs. Abdul–Haqq, nor did he independently review or analyze her medical records. Nurse–Midwife Alexander discussed Mrs. Abdul–Haqq's treatment with Dr. Miodovnik on only one occasion. The doctor highlighted the risks presented by the planned course of treatment. Nurse–Midwife Alexander, the treating health care provider, did not ask Dr. Miodovnik to take over any aspect of Mrs. Abdul–Haqq's care, and he did not do so. When interacting with her patient, Nurse–Midwife Alexander did not attribute a medical opinion to Dr. Miodovnik. Indeed, she did not even inform Mrs. Abdul–Haqq that a doctor had been consulted. These facts demonstrate as a matter of law that there was no traditional physician-patient relationship between Dr. Miodovnik and Mrs. Abdul–Haqq that could have given rise to a duty to intervene.[9] *See generally Hankerson v. Thomas,* 148 A.2d 583, 584 (D.C. 1959) ("The relation of physician and pa-

---

7. Although appellants dispute a portion of Dr. Miodovnik's testimony about the chart review, see note 3, *supra,* they have not proffered any evidence to contradict the account of Nurse–Midwife Alexander.

8. In July 2004, the American College of Obstetricians and Gynecologists ("ACOG") issued a Practice Bulletin entitled "Vaginal Birth After Previous Cesarean Delivery." The bulletin states, among other things, that "for women with 2 prior cesarean deliveries, only those with a prior vaginal delivery should be considered candidates for a spontaneous trial of labor." AMERICAN COLLEGE OF OBSTETRICIANS AND GYNECOLOGISTS, ACOG PRACTICE BULLETIN NO. 54: VAGINAL BIRTH AFTER PREVIOUS CESAREAN DELIVERY (2004). In other words, "a trial of labor should not be attempted" if the patient has "[t]wo prior uterine scars and no vaginal deliveries." *Id.* Dr. Miodovnik acknowledged that "it's clearly said, by ACOG, that if you have two cesarean sections without vaginal delivery, it is contraindicated of VBAC."

9. Courts disagree on whether a physician-patient relationship is a necessary element of a medical malpractice case. Some courts have held that even in the absence of a physician-patient relationship, a doctor may still have a duty of care in connection with his professional activities. *See Diggs v. Arizona Cardiologists, Ltd.,* 198 Ariz. 198, 8 P.3d 386, 387 (App.2000) (holding that "an express physician-patient relationship is not a requisite for finding a duty of reasonable care"); *Greenberg v. Perkins,* 845 P.2d 530 (Colo.1993) (in the context of independent medical examinations, a duty may be imposed despite the lack of a physician-patient relationship). Other courts have held that there is no duty in the absence of a physician-patient relationship. *See Wilson v. Athens–Limestone Hosp.,* 894 So.2d 630, 633 (Ala.2004) (liability for medical malpractice is based on the breach of a duty, which depends on the existence of a physician-patient relationship); *McKinney v. Schlatter,* 118 Ohio App.3d 328, 692 N.E.2d 1045, 1047 (1997) (holding that the existence of a duty "depends upon whether there was a physician-patient relationship"); *Wheeler v. Yettie Kersting Mem'l Hosp.,* 866 S.W.2d 32, 38 (Tex.App.1993); *Hill v. Kokosky,* 186 Mich. App. 300, 463 N.W.2d 265, 266 (1990). In *Newborn v. United States,* 238 F.Supp.2d 145,

tient is a consensual one depending on the physician's acceptance of the patient and the latter's assent to the medical services."); [10] *Dehn v. Edgecombe*, 384 Md. 606, 865 A.2d 603, 611 (2005) ("What is important . . . is that the relationship is a consensual one, and when no prior relationship exists, the physician must take some action to treat the person before the physician-patient relationship can be established."); *Dodd–Anderson v. Henderson*, 107 F.3d 20, 1997 WL 60743, at *2 (10th Cir.1997) (unpublished) [11] ("[T]he minimal involvement Dr. Henderson had with this patient did not raise a genuine issue as to whether Dr. Henderson's acts established a traditional doctor-patient relationship.").

## B. Did the Asserted Duty Arise out of Dr. Miodovnik's Role as Consulting Physician?

■■■ Nor did Dr. Miodovnik acquire a duty to order a pre-labor cesarean section for Mrs. Abdul–Haqq or to counsel her directly either because of his relationship with the DCBC or by virtue of his participation in the chart review.

### 1. The Formal Relationship Between the DCBC and Dr. Miodovnik

The DCBC did enter into agreements with Dr. Miodovnik, but the existence of this formal relationship does not mean that every interaction between the nurse-midwives and the doctor was a "formal consultation," as that term is used by medical professionals. [12] Moreover, nothing in those MOUs either authorized or obligated Dr. Miodovnik to usurp control over the care and treatment of DCBC clients. Although Dr. Miodovnik arguably had a contractual duty to the DCBC to be available to accept the transfer of a patient's care (or to designate another obstetrician who would do so), [13] the nurse-midwives did not ask him to take a more active role in Mrs. Abdul–Haqq's treatment. *See In re Sealed Case*, 314 U.S.App. D.C. 271, 274, 67 F.3d 965, 968 (1995) ("[A]ny duty owed

149 n. 2 (D.D.C.2002), the court opined that, under District of Columbia law, "the existence of a physician-patient relationship . . . is not one of the elements of negligence in cases against doctors." We have not found a case where this court has decided that issue, and we need not decide it here. In the next section we consider whether a duty arose even though a physician-patient relationship had not been established.

**10.** In *Hankerson* we said that "[t]he existence of [a physician-patient] relationship is a question of fact." 148 A.2d at 584. That general statement does not preclude a grant of summary judgment in appropriate circumstances, however.

**11.** Because it is an unpublished opinion of the Tenth Circuit, we consider the decision in *Dodd–Anderson v. Henderson* in light of that court's rules. Pursuant to Tenth Circuit Rule 32.1, "[u]npublished decisions are not precedential, but may be cited for their persuasive value." Consequently, we treat the decision

in *Dodd–Anderson v. Henderson* as persuasive, not binding, authority (which, of course, is the same way we would treat the opinion if it were published).

**12.** As Dr. Miodovnik explained: "A consultation, I see as myself talking to the patient. And I never talked to Ms. Abdul–Haqq." An opinion of the ACOG Committee on Ethics distinguishes between "professional dialogue" and a "formal consultation," which often includes an examination of the patient. AMERICAN COLLEGE OF OBSTETRICIANS AND GYNECOLOGISTS, COMMITTEE ON ETHICS, COMMITTEE OPINION No. 365: SEEKING AND GIVING CONSULTATION (2007).

**13.** If a transfer of care were required, Dr. Miodovnik would not necessarily treat the patient. The MOUs make clear that he could delegate responsibility to another doctor. Moreover, under the DCBC Policies and Practice Guidelines, "If an antepartum transfer to medical management is necessary, clients will have the option of choosing their own physician or use [sic] the DCBC's consultant."

by the defendant Consultant in the circumstances of this case was limited to a careful review of the laboratory records referred to him by Mr. B's primary physician.").

The DCBC and Dr. Miodovnik agreed to develop a system for "medical consultation and backup OB/GYN services." As occurs when other health care practitioners cooperate, the MOUs contemplated that interaction between Dr. Miodovnik and the nurse-midwives at the DCBC would range across a spectrum. The MOUs mention "consultation," "review and evaluation of specific client medical records," "work[ing] in collaboration and/or under medical direction when complications arise," and "accept[ing] and/or delegat[ing] responsibility for medical [management] and/or co-management of complicated clients."[14] The MOUs did not establish a duty for Dr. Miodovnik to intervene without request in the care and treatment of DCBC patients. *See In re Sealed Case,* 314 U.S.App. D.C. at 276, 67 F.3d at 970 (concluding as a matter of law that the standard of care owed by the consulting physician extended "only to the careful performance of the duties outlined by the contractual agreement"); *Dodd–Anderson v. Stevens,* 905 F.Supp. 937, 949 (D. Kansas 1995) ("The extent of the undertaking defines the scope of the duty and a defendant cannot be held liable for the negligent performance of a task which he or she did not agree to assume."), *aff'd,* 107 F.3d 20 (10th Cir.1997) (unpublished).

### 2. The Effect of Consultation

In some circumstances courts have held that, even in the absence of a formal arrangement, the fact that consultation has occurred may create a duty to the patient. *See Diggs v. Arizona Cardiologists, Ltd.,* 198 Ariz. 198, 8 P.3d 386, 390 (App.2000) (consulting cardiologist owed a duty of care to patient where emergency room physician lacked "the expertise to interpret the echocardiogram"); *Cogswell v. Chapman,* 249 A.D.2d 865, 672 N.Y.S.2d 460, 462 (1998) (taking into account the totality of the record, there was a factual question whether the consultant had a duty to the patient "especially in light of [his] expertise in the field" and the emergency room physician's lack of expertise). Other courts that have addressed the issue have found that a consultation with a treating physician did not give rise to a duty. *See Bessenyei v. Raiti,* 266 F.Supp.2d 408, 413 (D.Md.2003) (consulting physician had no duty where he discussed the case with an emergency room doctor "of comparable ability and competence to handle the situation" who retained "decision-making authority over plaintiff's course of treatment"); *Schrader v. Kohout,* 239 Ga.App. 134, 522 S.E.2d 19, 22 (1999) (factual record did not reveal "acceptance of direct responsibility and control"); *Hill v. Kokosky,* 186 Mich.App. 300, 463 N.W.2d 265, 268 (1990) (consulting physician had no duty where the treating practitioners "were not under his direction or control"). These decisions are context-specific and do not establish a general rule.

Appellants rely heavily upon *Diggs,* where Dr. Valdez, a cardiologist, briefly consulted with Dr. Johnson, an emergency

---

14. Nurse-midwives "practice within a health care system that provides for consultation, collaborative management, or referral, as indicated by the health status of the client." *See* AMERICAN COLLEGE OF NURSE MIDWIVES, STANDARDS FOR THE PRACTICE OF MIDWIFERY (2003); *see also* AMERICAN COLLEGE OF OBSTETRICIANS AND GYNECOLOGISTS, COMMITTEE ON ETHICS, COMMITTEE OPINION No. 365: SEEKING AND GIVING CONSULTATION (2007) (defining three levels of consultation: a single-visit consultation, continuing collaborative care, and transfer of primary clinical responsibility, and identifying "professional dialogue" as another, less formal, type of interaction).

room physician. He reviewed the results of an electrocardiogram (EKG) and an echocardiogram and agreed that the patient was suffering from pericarditis rather than a myocardial infarction. The court emphasized that the cardiologist voluntarily provided his expertise to the emergency room physician, knowing that it was necessary for the protection of the patient and that the other doctor would rely on it. 8 P.3d at 390. "Dr. Johnson was not free to accept or reject Dr. Valdez's advice. Dr. Johnson was not a cardiologist; he needed the specialized knowledge of someone such as Dr. Valdez to read the echocardiogram and to confirm his interpretation of [the patient's] EKG." *Id.* at 391. Moreover, "Dr. Valdez admitted that his advice significantly affected [the patient's] treatment." *Id.* Under these circumstances, the court held that the cardiologist owed a duty of care although he had never seen the patient.[15]

Analogizing to *Diggs* and similar cases involving medical diagnosis, appellants argue that Dr. Miodovnik had a duty to intervene because he was a doctor specializing in obstetrics and therefore had superior knowledge and skill. We disagree. With respect to the skills relevant here, Dr. Miodovnik was a peer of Nurse–Midwife Alexander, not her superior. The nurse-midwives at the DCBC were independent practitioners fully qualified to act in these circumstances. While it is true that, as between Dr. Miodovnik and Nurse–Midwife Alexander, only the doctor was qualified to *perform* a cesarean section, she was no less qualified than he to *speak with* the patient and *arrange for* the surgery. Nor was Dr. Miodovnik uniquely competent to discuss the risks of a VBAC with Mrs. Abdul–Haqq. He was entitled to rely upon Nurse–Midwife Alexander to discuss those risks with her own patient. *See Fowerbaugh v. University Hosps.*, 118 Ohio App.3d 402, 692 N.E.2d 1091, 1094 (1997) ("None of the cases [cited] provides that consulting physicians have an absolute duty to communicate their findings to the patient directly, either orally or in writing.").

Nor did Dr. Miodovnik have a duty to override the nurse-midwife's plan of care.

---

**15.** *Diggs* relied in part on RESTATEMENT (SECOND) OF TORTS § 324A, which the Arizona Court of Appeals had adopted. RESTATEMENT (SECOND) OF TORTS § 324A provides "One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking if (a) his failure to exercise reasonable care increases the risks of such harm, or (b) he has undertaken to perform a duty owed by the other to the third person, or (c) the harm is suffered because of reliance of the other or the third person upon the undertaking." We have not adopted § 324A in this jurisdiction, but even if we were to do so, it would not apply here for several reasons: (1) Dr. Miodovnik did not, through his actions or inaction, leave Mrs. Abdul–Haqq in a worse condition; (2) there is no evidence that Dr. Miodovnik took over the duties the nurse-midwives owed to Mrs. Abdul–Haqq; and (3) there is no evidence that the injury in question was suffered because the chart review took place. RESTATEMENT (SECOND) OF TORTS § 324, which provides, "One who, being under no duty to do so, takes charge of another who is helpless adequately to aid or protect himself is subject to liability to the other for any bodily harm caused to him by (a) the failure of the actor to exercise reasonable care to secure the safety of the other while within the actor's charge, or (b) the actor's discontinuing his aid or protection, if by so doing he leaves the other in a worse position than when the actor took charge of him," is also inapplicable because: (1) Mrs. Abdul–Haqq was not in a helpless state when Dr. Miodovnik and Nurse–Midwife Alexander conducted the chart review; (2) Dr. Miodovnik did not take charge of her care and treatment; and (3) Dr. Miodovnik did not, through his actions or inaction, leave Mrs. Abdul–Haqq in a worse condition.

The record establishes that Dr. Miodovnik's role was, and was intended to be, limited in scope. He did not become in practical terms the ultimate decision-maker determining the course of Mrs. Abdul-Haqq's treatment. *See Newborn v. United States*, 238 F.Supp.2d 145, 149–50 (D.D.C. 2002) (finding no duty where the consulting doctor did not play a supervisory role, the treating practitioner maintained independent judgment, and the consulting physician "did not provide the extensive and continuous type of consultation that made her practically the ultimate decisionmaker in [the patient's] treatment"), *aff'd*, 84 Fed. Appx. 97, 98 (D.C.Cir.2003) (noting that the undisputed facts "fail to indicate the consulting physician's brief exchanges with the primary care provider were anything but mere suggestions").

It is possible that if Dr. Miodovnik had insisted that the nurse-midwives schedule a cesarean section, they would have done so, but the possibility that he could have prevented this tragedy did not create a duty for him to intervene.[16] *See Feirson v. District of Columbia*, 362 F.Supp.2d 244, 252 (D.D.C.2005) ("[T]here is no genuine issue of material fact as to whether the contract between PFC [a private professional health organization] and the District created an affirmative duty on the part of the physician defendants to protect Sgt. Feirson." (applying RESTATEMENT (SECOND) OF TORTS § 314));[17] *see also Bessenyei*, 266 F.Supp.2d at 412–13 (declining to regard the consulting doctor as a joint provider of medical services although he acknowledged knowing that the treating practitioner would most likely consider his advice in making a decision; "an implication that one will be considering another's opinion in the decision-making process and a declaration that one is relying upon the advice being given to control the course of treatment are two very different things"). As discussed above, Dr. Miodovnik was entitled to rely upon the nurse-midwives of DCBC to reiterate the risks of a VBAC to their patient. There is no evidence in the record that the DCBC turned over Mrs. Abdul-Haqq's care to Dr. Miodovnik. *See Newborn*, 238 F.Supp.2d at 149 (concluding that the existence and nature of a consulting doctor's duty "depend[ ] upon the degree and frequency of her involvement with the patient's treatment. Substantial or frequent consultation that amounts to virtual supervision of a patient's treatment tends to give rise to a duty, whereas informal or occasional consultation does not.").

## VI. There Was No Duty to Intervene

We have found the decision in *Dodd-Anderson v. Stevens*, 905 F.Supp. 937 (D. Kansas 1995), *aff'd*, *Dodd-Anderson v. Henderson*, 107 F.3d 20, 1997 WL 60743 (10th Cir.1997) (unpublished), to be helpful in analyzing whether there was a duty to intervene in circumstances like these. In

---

16. Appellants argue that a duty of care should be imposed upon Dr. Miodovnik because the harm to Ilyaas Gilbert was foreseeable to him. But, as the trial court correctly held, "Whether a duty exists is not simply a question of foreseeability. It is ultimately a question of fairness and involves a weighing of the relationship of the parties, the nature of the risk, and the public interest in the proposed solution." *Knippen v. Ford Motor Co.*, 178 U.S.App. D.C. 227, 234, 546 F.2d 993, 1000 (1976) (internal quotation marks and alterations omitted). *See Odemns v. District of Co-*lumbia, 930 A.2d 137, 144 (D.C.2007) (declining to impose a duty upon WASA under the foreseeability of harm test); *Hoehn v. United States*, 217 F.Supp.2d 39, 45 (D.D.C.2002) (quoting *Knippen* ).

17. Section 314 of the RESTATEMENT provides: "The fact that the actor realizes or should realize that action on his part is necessary for another's aid or protection does not of itself impose upon him a duty to take such action."

that case, which also involved a newborn child, the Tenth Circuit rejected the argument that Dr. Henderson, the hospital's chief-of-staff, who had consulted with the baby's attending physician, had a duty to intervene and have the baby transferred more promptly to another facility better equipped to handle her needs. The court determined that (1) Dr. Henderson had insufficient contact with the patient to establish a doctor-patient relationship, (2) Dr. Henderson had no duty to force the attending physician to follow his advice, (3) there was no evidence that Dr. Henderson "was wrong" in informing the treating physician of his impressions based on his limited knowledge of the patient, (4) Dr. Henderson's duty was limited to the service he undertook, and (5) "whatever duties Dr. Henderson owed the parties were fulfilled." *See* 107 F.3d 20, 1997 WL 60743. The circuit court upheld the district court's ruling, "as a matter of law, that [Dr. Henderson] had no legal duty to 'take charge' of [the baby's] care and arrange for her immediate transfer to another hospital." *Dodd–Anderson v. Stevens,* 905 F.Supp. at 948, *aff'd, Dodd–Anderson v. Henderson,* 107 F.3d 20, 1997 WL 60743 (10th Cir.1997) (unpublished).

Similarly, Dr. Miodovnik did not have a duty to take charge of Mrs. Abdul–Haqq's treatment. *See Dodd–Anderson v. Stevens,* 905 F.Supp. at 948 (holding that "no reasonable person, applying contemporary standards, would recognize and agree that a physician has, or should have, a legal duty to unilaterally and perhaps forcibly override the medical judgment of another physician, particularly a treating physician. The list of adverse consequences to the medical community and to patients is obvious and endless . . . ."), *aff'd,* 107 F.3d 20, 1997 WL 60743, at *2 (10th Cir.1997) (unpublished) (reporting that it had found no cases holding that "a physician who merely offers medical advice to an attending phy-

sician . . . has a duty to force the attending physician to follow that advice").

The decision in *Wilson v. Athens–Limestone Hosp.,* 894 So.2d 630 (Ala.2004), addressed similar issues. Dr. Teng, a pediatrician who had a pre-existing physician-patient relationship with a child, learned that she was in the emergency room and briefly discussed her case with the emergency room doctor. 894 So.2d at 632. Dr. Teng did not treat or diagnose the child during her visit to the emergency room and did not prescribe any medication or give any medical advice on that occasion. *Id.* at 635. The emergency room doctors retained control over the child's treatment at all times during that visit. *Id.* Relying on the decision in *Dodd–Anderson v. Stevens,* the Supreme Court of Alabama held that Dr. Teng did not have a duty to intervene in the child's treatment by the emergency room doctor. *Id.*

Appellants do not cite a single comparable case in which a court imposed upon a doctor a duty to take over the care and treatment of the patient of an independent health care professional, without a request to do so. Nor do appellants cite any cases in which a court held that a doctor had a duty to inform another practitioner's patient of a risk or danger when the treating practitioner was available to do so.

Nurse–Midwife Alexander acknowledged that Dr. Miodovnik advised her to reiterate to Mrs. Abdul–Haqq the risks of attempting a VBAC after two cesarean sections. The DCBC nurse-midwives were fully competent to discuss these risks with Mrs. Abdul–Haqq and to convince her that a third cesarean section was necessary. This was not an emergency situation—at 35–37 weeks of gestation, Mrs. Abdul–Haqq was not due for another few weeks. There was ample time for Nurse–Midwife Alexander or one of her colleagues to ap-

proach Mrs. Abdul–Haqq, to discuss the risks, and to seek additional help if she was unable to convince the patient to undergo a cesarean section. Dr. Miodovnik did not have a duty to monitor the situation to make sure Nurse–Midwife Alexander fulfilled her obligation to Mrs. Abdul–Haqq.[18]

## VII. Conclusion

Under the circumstances of this case, we agree with the trial court's determination that Dr. Miodovnik had no duty to intervene in Mrs. Abdul–Haqq's care by ordering a cesarean section or by personally advising her not to attempt a VBAC. The judgment of the Superior Court is hereby

*Affirmed.*

THOMPSON, Associate Judge, concurring:

I join in the opinion written by Judge Fisher, but I write separately, in response to Judge Ruiz's dissent, to underscore several points.

First, there is no dispute that Dr. Miodovnik's review of the nurse-midwife's notes on Ms. Abdul–Haqq was a routine review. Ms. Abdul–Haqq's case was one of several presented at the meeting with Dr. Miodovnik, and nothing in the record suggests that anyone viewed this as a complicated case, a case of a type the nurse-midwives had not seen before, or a case involving risks with which the nurse-midwives were unfamiliar. Quite the contrary, the record shows that DCBC had given Ms. Abdul–Haqq a consent form that particularly addressed the risks associated not only with a first VBAC, but also with a vaginal birth after two cesarean sections.

Second, it is important to describe in detail what the DCBC consent form signed by Ms. Abdul–Haqq disclosed to her. It disclosed *inter alia* that:

A tear or opening in the uterus (womb) occurs in 5 to 10 women out of every 1,000 low risk women who try VBAC ·(0.5% to 1.0%).... *Risks to the baby if there is a tear of the uterus are brain damage and death....* About 10% of the time the baby is harmed when the uterus tears.... *The risk of your uterus tearing during labor is increased with any of the following: ... More than 1 previous cesarean section ....* If a vaginal birth cannot occur, then a cesarean birth must be done. The risk of infection is doubled when a cesarean delivery is done after labor rather than before labor.

(Italics added.) Given what DCBC told its patient Ms. Abdul–Haqq on this form (which she signed), I see no basis for holding that Dr. Miodovnik's differing perception of the risk a VBAC presented gave rise to the claimed duty to Ms. Abdul–Haqq.

Third, an important fact in this case is that Ms. Abdul–Haqq "very much wanted to have a vaginal birth." That was her choice to make, notwithstanding the risks and notwithstanding the statement in the American College of Obstetricians and Gynecologists (ACOG) Practice Bulletin that a trial of labor is "contraindicated" after a cesarean section. *Cf. Miller–McGee v. Washington Hosp. Ctr.,* 920 A.2d 430, 442 (D.C.2007) (rejecting, as premise of claim that patient would have had no choice but to consent to a forceps-assisted vaginal delivery, argument "that a c-section was not an alternative for appellant because 'a

---

**18.** Contrary to the suggestion of the dissent, see *post* at 1015, our holding in no way implies a general rule "that under District of Columbia law there is no duty for a consult-ing physician to render appropriate advice simply because the patient is primarily being treated by another primary care giver."

c-section is not offered to a patient as an alternative to vaginal delivery or assisted vaginal delivery unless for some reason surgery is medically necessary,' " since the argument "suggests that professional custom or practice alone [to the exclusion of patient self-determination] may dictate whether the obstetrical patient has an alternative"). And, the record does not contain standard-of-care testimony that allowing a trial of labor after two cesarean sections where the patient understands the risks and chooses that course violates the standard of care.[1] So it cannot be assumed that Dr. Miodovnik had a duty—whether arising from knowledge that the nurse-midwives took his advice very seriously, or from knowledge that the nurse-midwives "did what he advised them to do," or from his persuasive abilities—to make some type of effort to assure that the course of treatment was a cesarean.

Fourth, contrary to the statement in the dissent that Dr. Miodovnik did not "record the request he claims he made for Nurse–Midwife Alexander to impress on Ms. Abdul–Haqq the serious risks of attempting labor and vaginal delivery," Dr. Miodovnik's notes do corroborate his statement. His recommended plan was that the "patient understand"[2] the risk of VBAC after a second cesarean section (and that prophylactic antibiotics be given during labor,

if the patient continued to want a trial of labor). Assuming that Dr. Miodovnik had a duty to recommend a plan, I think there is no genuine issue that he did so.

Fifth, although plaintiffs alleged in their complaint that Dr. Miodovnik "fail[ed] to recognize the risks associated with allowing Plaintiff to deliver vaginally," the record belies that claim. As to plaintiffs' claim that Dr. Miodovnik "fail[ed] to give proper advice in consulting with [DCBC]," I believe Judge Fisher has aptly characterized the claim as one that Dr. Miodovnik did not intervene—either by "order[ing] the scheduled surgical delivery that Ms. Abdul–Haqq clearly required" (a quote from appellants' brief), instructing the midwives not to assist Ms. Abdul–Haqq with a vaginal delivery, ordering that Ms. Abdul–Haqq be told that she must have a cesarean, following up with the nurse-midwives to make sure they had reiterated the risks to Ms. Abdul–Haqq, or, perhaps, making sure that Ms. Abdul–Haqq heard an opinion attributed to Dr. Miodovnik. I believe the majority opinion rightly declines to recognize a duty to do any of those things in light of the nurse-midwives' independent responsibility for the care of their patients. I find persuasive the comments of *amici* American College of Nurse–Midwives and American Association of Birth Centers that, although

---

1. Both the majority opinion and the dissent note Dr. Miodovnik's testimony that VBAC "under standard of care ... was not allowed ... [b]ecause it's clearly said, by ACOG, that if you have two caesarean sections without vaginal delivery, it is contraindicated of VBAC." But Dr. Miodovnik was not testifying as a standard-of-care expert, and to say that a procedure is "contraindicated" is not necessarily to say that allowing it or performing it violates the standard of care. *Cf. Wyszomierski v. Siracusa*, 290 Conn. 225, 963 A.2d 943, 950 (2009) ("The word 'contraindicate' simply means 'to make (a treatment or procedure) inadvisable.' ... [W]e reject the plaintiff's argument that testimony regarding

contraindications implicated the relevant standard of care").

2. My colleagues add a "[sic]" to the quotation at this point, as if Dr. Miodovnik was merely observing that the "patient understands the risks." I think the notation in the "Plan" section of Dr. Miodovnik's notes is more reasonably read to reflect use of the subjunctive: Dr. Miodovnik's recommended plan that "the patient understand"—i.e., be made to understand—"that the risk of VBAC after two cesarean section is *much* higher for uterine rupture—fetal death."

only a surgeon may perform a cesarean section, it is within the scope of practice of certified nurse midwives to "determin[e] whether a client requires a cesarean section." And, as Judge Fisher correctly notes, "nothing in [the] MOUs either authorized or obligated Dr. Miodovnik to usurp control over the care and treatment of DCBC clients."

Finally, I respond to the observation in the dissent that Ms. Abdul–Haqq "readily agreed" to a cesarean section after Dr. Leslie advised her of the risk of attempting a vaginal delivery, and the statement that "had [such advice] been given timely, [it] likely would have averted the tragedy in this case." I would observe (and I think anyone who has undergone labor can attest) that a woman's readiness, once labor is upon her, to consent to a procedure she did not previously want, probably says more about the pain and anxiety attendant to labor than about the adequacy or inadequacy of previous warnings and advice.[3] More to the point, the fact that Ms. Abdul–Haqq readily agreed to a cesarean after she went into labor does not support a conclusion that Dr. Miodovnik owed a duty to her.

RUIZ, Associate Judge, dissenting:

This medical malpractice case presents an issue of first impression for our court: when does a non-primary, or consulting, doctor owe a duty to a patient?[1] Specifically, we are asked whether Dr. Miodovnik owed a duty of reasonable care to Mrs. Saara Abdul–Haqq, a patient of the District of Columbia Birth Center ("DCBC").

We are not asked to decide what the standard of care is or whether it was breached, as the case did not proceed on that basis to summary judgment in the trial court.

As the majority correctly notes, in most of our previously-decided medical malpractice cases, there has been no dispute that the physician, or hospital, owed a duty to the patient. See *ante* note 5. Moreover, facts that go to the existence of a duty and what the standard of care is might overlap. But these are legally distinct issues; the former is a legal question for the court, and the latter, one of fact for the jury. In deciding that Dr. Miodovnik had no "duty to intervene" the majority has conflated these two concepts, and improperly decides a factual question that is for the jury and has yet to be addressed by the parties. In short, it has non-suited the case on the merits instead of deciding the legal issue of duty *vel non* that has been presented to the court.

I disagree with the majority's analysis and its conclusion. Because the facts of record suffice to establish that a duty was owed to Mrs. Abdul–Haqq by Dr. Miodovnik, the grant of summary judgment to Dr. Miodovnik and his employer, the Washington Hospital Center, was in error and should be reversed. The case should be remanded so that the parties can develop the record on the standard of care, whether it was breached, and whether the breach caused the damages alleged.

## I. Duty vs. Standard of Care

"It is fundamental in tort law that one can be held liable for negligence only if

---

**3.** I note that in addition to signing the DCBC consent form, Ms. Abdul–Haqq initialed a line stating, "If I choose a VBAC, this consent will be reviewed as needed during the labor. I may want to ask for a repeat cesarean section or my doctor may find a need to deliver my baby by cesarean section."

**1.** *See In re Sealed Case,* 314 U.S.App. D.C. 271, 276, 67 F.3d 965, 970 (1995) ("We have not found any District of Columbia cases describing the duty owed to a patient by a consulting physician in a contractual relationship with the patient's regular doctor....").

there was a duty. . . ." *Williams v. Baker,* 572 A.2d 1062, 1064 (D.C.1990) (en banc); *see also N.O.L. v. District of Columbia,* 674 A.2d 498, 499 n. 2 (D.C.1995) ("The foundation of modern negligence law is the existence of a duty owed by the defendant to the plaintiff."). Once duty is established, it is well settled that "[i]n a medical malpractice action, there are three elements a plaintiff must show to establish a prima facie case: '(1) the applicable standard of care; (2) a deviation from that standard of care by the defendant; and (3) a causal relationship between that deviation and the plaintiff's injury.' " *Burke v. Scaggs,* 867 A.2d 213, 217 (D.C.2005) (emphasis omitted) (quoting *Talley v. Varma,* 689 A.2d 547, 552 (D.C.1997)).

The majority "assume[s], without deciding, that Dr. Miodovnik had a duty to use reasonable care when conferring with the nurse-midwives from DCBC, and that in some circumstances this duty would extend to the patient." See *ante* page 990. Based on the assumption the majority is willing to make—that Dr. Miodovnik owed a duty to Mrs. Abdul–Haqq "in some circumstances"—the case should be remanded for further proceedings to determine what the scope of that duty is under the circumstances of this case and whether the applicable standard of care was breached. Instead, the majority frames the "crucial question in this case" as "whether Dr. Miodovnik had a *duty to intervene* in the care of Mrs. Abdul–Haqq." See *ante* note 5 & pages 989–91 (emphasis added). The majority then concludes that summary judgment was properly granted to appellees because Dr. Miodovnik had no duty to "take charge of Mrs. Abdul–Haqq's treatment," see *ante* page 996, or "take over [her] care and treatment," see *ante* page 996, and had "no duty to intervene in Mrs. Abdul–Haqq's care by ordering a caesarean section or by personally advising her

not to attempt a VBAC." See *ante* page 997.

There is a significant and well-established distinction between the existence of a duty and a determination of the applicable standard of care. Whether a duty exists is a question of law to be determined by the court, *see Settles v. Redstone Dev. Corp.,* 797 A.2d 692, 695 (D.C.2002) ("The question . . . whether a defendant owes a duty to the plaintiff under a particular set of circumstances is entirely a question of law that must be determined only by the court." (alteration in original) (quoting *Croce v. Hall,* 657 A.2d 307, 310 (D.C. 1995))), whereas a determination of the applicable standard of care is a question of fact to be found by the jury based on expert testimony. *See, e.g., Burke,* 867 A.2d at 219 ("Determining the applicable standard of care is a question of fact for the jury."); *Strickland v. Pinder,* 899 A.2d 770, 773 (D.C.2006) ("At the outset of a medical malpractice case, 'the plaintiff must establish through expert testimony the course of action that a reasonably prudent doctor with the defendant's specialty would have taken under the same or similar circumstances.' " (quoting *Meek v. Shepard,* 484 A.2d 579, 581 (D.C.1984))); *Ray v. Am. Nat'l Red Cross,* 696 A.2d 399, 404 (D.C.1997) ("[T]he jury, informed by expert testimony where appropriate, determines what the applicable standard of care is in a particular case.").

Because of the separate and distinct natures of the duty and standard of care inquiries, I disagree with the majority's formulation of the issue before us. Appellees moved for summary judgment *solely* on the ground that Dr. Miodovnik had "no duty" to Mrs. Abdul–Haqq. They have not argued—in the trial court or on appeal—that appellants have no evidence of the standard of care or its breach. The case simply has not progressed to that

point. The scope of the duty (i.e., the standard of care) that Dr. Miodovnik had, if any, was simply not before the trial court on summary judgment and is not before us on appeal.

Neither the trial court nor the parties framed the question on summary judgment as whether Dr. Miodovnik had a duty "to intervene," or "take over" Mrs. Abdul–Haqq's case and displace the nurse-midwives who were her primary healthcare providers. Appellants did not allege in their complaint that Dr. Miodovnik had a duty "to intervene." What the complaint alleges is that Dr. Miodovnik breached the standard of care by failing, *inter alia*, "to properly inform [Mrs. Abdul–Haqq] of the risk of fetal injury in delivering vaginally following two prior caesarean sections and no prior vaginal delivery," "to give proper advice in consulting with [DCBC]," "to advise [DCBC] that Mrs. Abdul–Haqq should be referred to an obstetrician for management in light of [her] obstetrical history," "to adhere to ACOG Practice Bulletin No. 54," and "to have and follow safe policies concerning the care and treatment of VBAC patients with two prior caesarian sections and no prior vaginal delivery." In

short, as appellant's brief succinctly puts it, of failing "to properly perform the one function required of him—determining a proper treatment plan." [2] Whether Dr. Miodovnik should have "intervened," moreover, is not relevant to whether he had a legal duty but to the standard of care, *i.e.*, what someone in Dr. Miodovnik's consulting role should have done under the circumstances.

A further flaw in the majority's analysis is its erroneous premise that there is "no evidence" that Dr. Miodovnik "gave bad advice or failed to identify any material risks of which Nurse–Midwife Alexander was not aware." See *ante* page 990. At this preliminary stage of the proceedings, the only question is whether a legal duty was owed. Appellees have not challenged the evidence on standard of care because the parties have not yet developed the factual record on the standard of care.[3]

In any event, although I express no opinion on the merits of appellants' claims, I note that even at this preliminary stage of the litigation the record shows that there is evidence from which a jury could find that Dr. Miodovnik breached the stan-

2. At another point in their brief, appellants formulate the claimed negligence as Dr. Miodovnik's failure "to order a pre-labor caesarean section for Mrs. Abdul–Haqq and [that he] instead signed off on a treatment plan calling for a VBAC." The majority opinion states that it "understand[s] appellants' argument to mean that Dr. Miodovnik had a duty (1) to override the judgment of the nurse-midwives and alter the plan of treatment, and (2) to communicate with Mrs. Abdul–Haqq directly and counsel that an attempt at a VBAC was inadvisable." See *ante* page 991. This is not, however, the question of duty *vel non* that the trial court decided and that appellants have presented to this court on appeal, but a reformulation created by the majority opinion. My colleagues in the majority recognize that appellants have presented a different argument but, without elaboration, "decline to

approach [their] analysis in that fashion." See *ante* note 5.

3. In their Rule 26(b)(4) Statement, appellants proffered that Dr. William N. Spellery, a board-certified maternal fetal specialist, and Dr. Richard L. Stokes, a board-certified obstetrician/gynecologist, would testify that defendants violated the standard of care by failing to recognize Mrs. Abdul–Haqq's "low chance of a successful vaginal delivery" and "fail[ing] to manage the pregnancy appropriately." Specifically with respect to Dr. Miodovnik, these proposed experts were expected to testify that "Dr. Miodovnik failed to give a proper consultation in this case." Other experts were proffered to testify on causation and damages. None of their testimony (assuming their depositions have been taken) was presented to the trial court or is part of the record on appeal.

dard of care. Dr. Miodovnik testified that he told Nurse–Midwife Alexander not only to reiterate the risks of a vaginal delivery to Mrs. Abdul–Haqq *but also to advise her that a caesarean section was medically recommended, and that he expected that the nurse-midwife would do so.*[4] From this testimony—which Nurse–Midwife Alexander disputes in part—a jury could reasonably infer that Dr. Miodovnik was well aware of the seriousness of the risk to Mrs. Abdul–Haqq, but that he failed to give the advice he thought necessary to the DCBC, that he failed to follow-up with the nurse-midwife to see whether Mrs. Abdul–Haqq continued on a course he considered to be ill-advised and, if necessary, to offer further advice and assistance to the nurse-midwives related to the patient's

treatment plan.[5] Whether Dr. Miodovnik owed a duty to the patient (which the majority is willing to assume), and what that duty required, including some sort of as yet-undefined "intervention" in her care beyond giving proper advice to DCBC, however, are two different things. The former is the question before the court; the latter is for the fact finder after hearing expert testimony and considering published standards.[6]

In my view, the majority has gone beyond the question presented to the court—whether a duty was owed—and has not only set out what it considers to be the standard of care (whether "to take charge" or "to intervene") but has also decided that Dr. Miodovnik did not breach it.[7] For the

4. Dr. Miodovnik testified that he "strongly recommended to the midwife that the patient [should] have [a] repeat caesarean section." Dr. Miodovnik said he did, but Nurse–Midwife Alexander denied that he recommended that Mrs. Abdul–Haqq should have a caesarean section.

5. The majority opinion opts not to take into account Dr. Miodovnik's testimony of what he purports to have told Nurse–Midwife Alexander to communicate to Mrs. Abdul–Haqq (that his medical recommendation was that she should not attempt a vaginal delivery but have a caesarian section) because Alexander and appellants dispute that he told her to do so. See *ante* note 3. But Dr. Miodovnik's testimony is part of the record and to ignore his testimony in light of Nurse–Midwife Alexander's refutation deprives appellants of the proper standard of review on summary judgement, that the evidence be viewed in the light most favorable to them. So viewed, Dr. Miodovnik's testimony suggests that he understood his duties as DCBC's consultant during chart review to include advising Nurse–Midwife Alexander to communicate his medical recommendation to Mrs. Abdul–Haqq.

6. Standards of practice that are written by the American College of Obstetricians and Gynecologists ("ACOG"), which were submitted with appellants' statement of disputed facts in

opposition to the motion for summary judgment provide:

> How should patients be counseled?
> The enthusiasm for VBAC varies greatly among patients and physicians. It is reasonable for women to undergo a trial of labor in a safe setting, but the potential complications should be discussed thoroughly and documented. If the type of previous incision is in doubt, attempts should be made to obtain the patient's medical records. After thorough counseling that weighs the individual benefits and risks of VBAC, the ultimate decision to attempt this procedure or undergo a repeat cesarean delivery should be made by the patient and her physician. Global mandates for a trial of labor after a previous cesarean delivery are inappropriate because individual risk factors are not considered. It should be recognized that there are repeat elective cesarean deliveries that are clinically indicated.... The informed consent process and the plan of management should be documented in the medical record.

ACOG, *ACOG Practice Bulletin—Vaginal Birth After Previous Cesarean Delivery*, No. 54, Jul. 2004, at 5 [hereinafter *ACOG Practice Bulletin No. 54* ].

7. The majority recognizes that "as a general rule, this court will decide only such questions as are necessary for a determination of the case presented for consideration, and will not render decisions in advance of such ne-

reasons discussed below, I would hold that the evidence established the existence of a duty, and remand the case for further proceedings on the remaining elements of negligence: what the national standard of care is for someone in Dr. Miodovnik's position, whether that standard was breached, and, if so, whether the breach was the proximate cause of appellants' injuries.

## II. Standard of Review for Summary Judgment

The question at issue in this appeal is whether the trial judge should have granted Dr. Miodovnik's motion for summary judgment on the ground that he did not owe a duty of reasonable care to the patient. Citing *Newborn v. United States*, 238 F.Supp.2d 145 (D.D.C.2002), *aff'd*, 84 Fed.Appx. 97 (D.C.Cir.2003) (unpublished), the trial judge ruled that Dr. Miodovnik's "isolated and non-binding consultation with [Nurse–Midwife] Alexander was insufficient to create a duty vis-vis plaintiff Abdul–Haqq."

In reviewing a grant of summary judgment this court must view the evidence in the light most favorable to the non-moving party, drawing all reasonable inferences from the evidence in her favor. *See Herbin v. Hoeffel*, 806 A.2d 186, 190–91 (D.C. 2002). "Summary judgment is proper if there are no disputed issues of material fact and a party is entitled to judgment as a matter of law." *Minch v. District of Columbia*, 952 A.2d 929, 936 (D.C.2008).

Viewing the facts of record in the light most favorable to appellants, who opposed the motion for summary judgment, the evidence established that not only pursuant to his formal contractual relationship as Medical Director of the DCBC, but also as a matter of fact, Dr. Miodovnik exercised a measure of control over the treatment of patients at the DCBC, and did so specifically in Mrs. Abdul–Haqq's case. Pursuant to the MOU for consulting services, the nurse-midwives had established a practice of regular consultation with Dr. Miodovnik to obtain an assessment and plan for patients between 34 and 37 weeks gestation. The nurse-midwives looked to Dr. Miodovnik for advice and recommendations, and they did what he advised them to do. Dr. Miodovnik reviewed Mrs. Abdul–Haqq's history of two prior caesarean sections, with no prior vaginal delivery, and wrote treatment notes and recommended medication for the proposed vaginal delivery on her individual medical chart. As discussed *infra*, these facts, viewed in their totality and favorably to appellants, when considered in light of the policy considerations that we and other jurisdictions have expressed in determining whether the law recognizes a duty, establish that Dr. Miodovnik owed a duty to Mrs. Abdul–Haqq. Because Dr. Miodovnik was not entitled to judgment as a matter of law, therefore, summary judgment for appellees was in error and should be reversed, so that the litigation can continue. Still to be addressed by the parties and submitted to the jury are several elements: what the standard of care is for a person in Dr. Miodovnik's position, whether he breached it, whether the injuries for which damages are claimed were proxi-

cessity." See *ante* page 990 (quoting *District of Columbia v. Wical Ltd. P'ship*, 630 A.2d 174, 182 (D.C.1993)). However, in conflating the concepts of duty and standard of care, the majority decides more than is necessary or even permissible because it proceeds to decide—and reject—the applicable standard of care as the "duty to intervene," rather than simply establishing whether the law recognizes a duty to adhere to the applicable standard of care and then allowing the parties to present evidence to the jury to determine, based on that evidence, what the standard of care is.

mately caused by the breach, and, if so, the amount of damages.

## III. Duty

### A. Physician–Patient Relationship

As the majority mentions, see *ante* note 9, courts disagree on whether a physician-patient relationship is necessary to give rise to a duty in a medical malpractice action. While some courts have held that such a relationship is not necessary to give rise to a duty, *see Diggs v. Arizona Cardiologists, Ltd.,* 198 Ariz. 198, 8 P.3d 386, 387 (Ct.App.2000); *Greenberg v. Perkins,* 845 P.2d 530, 538–39 (Colo.1993), others have held that a physician-patient relationship is a precondition to the existence of a legal duty. *See Wilson v. Athens–Limestone Hosp.,* 894 So.2d 630, 633 (Ala.2004); *Sterling v. Johns Hopkins Hosp.,* 145 Md. App. 161, 802 A.2d 440, 445 (2002); *Hill v. Kokosky,* 186 Mich.App. 300, 463 N.W.2d 265, 266 (1990); *Lownsbury v. VanBuren,* 94 Ohio St.3d 231, 762 N.E.2d 354, 357–58 (2002). I agree with the assessment of the D.C. federal trial court in *Newborn* that "[t]he existence of a physician-patient relationship ... is not one of the elements of negligence law in cases against doctors according to D.C. law." *Newborn,* 238 F.Supp.2d at 149 n. 2. This view is supported by our repeated statements that the existence of a duty depends on a "policy decision[ ]," *Williams,* 572 A.2d at 1064, that "the law will extend the responsibility for the conduct to the consequences which have in fact occurred." *District of Columbia v. Cooper,* 483 A.2d 317, 321 (D.C.1984) (quoting PROSSER, HANDBOOK OF THE LAW OF TORTS § 42 (4th ed.1971)). These statements strongly suggest that the duty analysis is rooted in the circumstances of the

particular case, and not on whether there is a traditional doctor-patient relationship.[8]

### B. Elements of Duty

In conducting a fact-based contextual analysis to determine whether a consulting doctor owes a duty to the patient, courts in this and other jurisdictions have considered a number of factors: the degree of supervision and control exercised by the consulting doctor over the primary healthcare provider, whether the consultation was required by policy or protocol, the existence of a contractual relationship, and considerations of public policy. All of these factors, when applied to the facts in this case, lead to the conclusion that Dr. Miodovnik owed a duty of reasonable care under the circumstances to Mrs. Abdul-Haqq.

"The existence *vel non* of a consulting doctor's duty to a patient and the nature of that duty depends upon the degree and frequency of her involvement with the patient's treatment. Substantial or frequent consultation that amounts to virtual supervision of a patient's treatment tends to give rise to a duty, whereas informal or occasional consultation does not."[9] *Newborn,* 238 F.Supp.2d at 149. There is no set test for determining whether a consulting physician's involvement is "substantial or frequent," or "informal or occasional"; rather, courts look to the "precise circumstances" of each case. *See id.* The critical factors that led the court in *Newborn* to determine that there was no duty were: (1) that the treating physicians retained control over the patient's treatment and did not look to the consulting doctor for supervision, and (2) that there was no poli-

---

**8.** Whether there is a doctor-patient relationship is "a question of fact." *Hankerson v. Thomas,* 148 A.2d 583, 584 (D.C.1959).

**9.** Although *Newborn* is not binding on our court, I find it persuasive in its application of D.C. law to the question of a consulting physician's duty.

cy or protocol requiring a consultation between doctors at the two institutions.[10] *Id.* at 150.

### 1. Supervision and Retention of Control

In *Newborn,* the primary treating physician was deemed to have "retained control" over a patient's treatment, despite consulting with another physician, based on several factors. First, the treating physician exercised "independent judgment" in determining treatment, 238 F.Supp.2d at 150 ("Dr. Devenport exercised independent judgment in treating Kenny ...."), which may be demonstrated by having the freedom to accept or reject the advice offered by the consulting physician. *See Sterling,* 802 A.2d at 455 (noting that "[w]here ... the treating physician exercises his or her own independent judgment in determining whether to accept or reject [a consultant's] advice, ... the consultative physician should not be regarded as a joint provider of medical services") (alterations in original) (quoting *Gilinsky v. Indelicato,* 894 F.Supp. 86, 92 (E.D.N.Y. 1995)); *compare Corbet v. McKinney,* 980 S.W.2d 166, 171 (Mo.Ct.App.1998) ("Dr. Ockner was free to accept or reject defendant's recommendation at his discretion."), *and Hill,* 463 N.W.2d at 267 ("Defendants' medical opinions ... were recommendations to be accepted or rejected by [the treating physician] as he saw fit."), *with*

*Diggs,* 8 P.3d at 391 ("Dr. Johnson did not exercise independent judgment as to Cynthia Diggs' diagnosis; rather he subordinated his professional judgment to that of the specialist in cardiology, Dr. Valdez."). Second, the primary physician was capable of handling the patient's medical crisis, *see Newborn,* 238 F.Supp.2d at 150 ("Dr. Merino ... believed that [Dr. Devenport] could handle treatment of a patient experiencing sickle cell crisis."); *see also Bessenyei v. Raiti,* 266 F.Supp.2d 408, 413 (D.Md.2003) ("The conversation that took place ... was a conversation between two doctors of comparable ability and competence to handle the situation."). Third, the advice received by the primary physician was in the nature of a second opinion or informal advice from a colleague. *See Newborn,* 238 F.Supp.2d at 150 ("Dr. Devenport stated that his call to Dr. Merino ... was to get a second opinion ...."); *see also Oja v. Kin,* 229 Mich.App. 184, 581 N.W.2d 739, 743 (1998) ("[M]erely listening to another physician's description of a patient's problem and offering a professional opinion regarding the proper course of treatment is not enough. Under those circumstances, a doctor ... is simply offering informal assistance to a colleague.").

On the other hand, a consulting physician becomes a joint provider of medical services to the patient, and incurs a legal duty to that patient, if (1) the consulting doctor's advice is in the nature of a diagno-

---

**10.** In *Newborn,* a child with sickle cell anemia was receiving treatment for a sickle cell crisis at Wurzburg Army Hospital in Germany. *Id.* at 145. The patient's treating physician in Germany, Dr. Devenport, sent an email to an attending hematologist/oncologist at Walter Reed Army Medical Center ("Walter Reed") seeking recommendations on how to treat the child's pain. *Id.* at 147. Dr. Merino at Walter Reed spoke to someone who had called from the hospital in Germany about pain medication; two days later, she replied by e-mail regarding medications for treating ab-

dominal pain. *Id.* at 147–48. Dr. Merino also spoke with Dr. Devenport about eventually sending the child to the United States and about managing the child's pain while he was in the hospital. *Id.* at 148. After the child died, the parents, two noncommissioned U.S. Army officers, brought a wrongful death and survival action against the United States under the Federal Torts Claims Act, alleging that Dr. Merino was negligent in her recommendations regarding the child's pain medication. *Id.* at 148.

sis or prescribes a course of treatment, *see Lounsbury*, 762 N.E.2d at 362 (noting that a physician may consent to a physician-patient relationship and thereby assume a duty by taking "certain actions that indicate knowing consent, such as examining, diagnosing, treating, or prescribing treatment for the patient."); *cf. Newborn*, 238 F.Supp.2d at 150 ("Dr. Devenport stated that his call to Dr. Merino ... [was] not to be directed on how to treat Kenny."), or (2) the consulting doctor knows that the treating physician looks for supervision from the consulting physician and will rely on that advice. *See Diggs*, 8 P.3d at 387 ("[W]hen Dr. Valdez undertook to give advice to Dr. Johnson regarding Mrs. Diggs' care and treatment, knowing that Dr. Johnson would rely on this advice, Dr. Valdez owed a duty of reasonable care to Mrs. Diggs."); *cf. Newborn*, 238 F.Supp.2d at 150 (noting that "[t]he doctors [in Germany] ... did not look to Dr. Merino for supervision" or "guidance"); *Cogswell v. Chapman*, 249 A.D.2d 865, 866–67, 672 N.Y.S.2d 460 (1998) (concluding that consulting doctor's involvement in patient's care was a disputed question of fact "especially in light of [the consulting doctor's] expertise in the field of ophthalmology and [the primary doctor's] lack of expertise in this area").

The record in this case, viewed favorably to appellants, amply supports the conclusion that, unlike the primary care physician in *Newborn*, the nurse-midwives did not retain exclusive control over Mrs. Abdul–Haqq's care—far from it. Nurse–Midwife Alexander testified that she and the other DCBC nurse-midwives "tried very hard to follow [Dr. Miodovnik's] recommendation[s];" Nurse–Midwife Mairi Rothman (who assisted Mrs. Abdul–Haqq when she arrived in labor to WHC) testified that the relationship between the DCBC nurse-midwives and Dr. Miodovnik was "such that he can tell us not to go

ahead and I have to do whatever he says," and while she "d[id]n't know that that's a rule," she said that "[i]t's common sense." Dr. Miodovnik agreed with the nurse-midwives' assessment, stating in his deposition that although nurse-midwives could choose to do otherwise, his "advice [and] recommendation should be taken very seriously by any obstetrician or independent practitioner such as a midwife." In short, the testimony shows that the nurse-midwives did not feel free to reject Dr. Miodovnik's advice, but rather looked to him for his superior knowledge and experience, and that Dr. Miodovnik saw himself as a supervisor providing essential guidance to them.

Dr. Miodovnik was not, as the majority suggests, a "peer" of Nurse–Midwife Alexander when they met to discuss Mrs. Abdul–Haqq's case on March 21, 2005. *See ante* page 994. Dr. Miodovnik was the Chief of Obstetrics and Gynecology at WHC and the Medical Director of DCBC, the employer of the nurse-midwives. Nurse–Midwife Alexander testified that Dr. Miodovnik was "our consulting obstetrician. He's an expert in obstetrics and gynecology. He is the senior person on our medical staff." She acknowledged that Dr. Miodovnik knows more about obstetrics than do the nurse-midwives. The consultation of March 21, 2005, therefore, was not "between two doctors of comparable ability and competence to handle the situation." *See Bessenyei*, 266 F.Supp.2d at 413. Dr. Miodovnik, as a self-described recognized expert in "maternal-fetal medicine," was in a superior position to assess the risks and correct any error in the proposed treatment plan. *See Diggs*, 8 P.3d at 390 (finding a duty where the consulting physician, "with his superior knowledge and experience, was in the best position to correct any error in [the treating physician's] diagnosis," and was aware that his advice would be relied upon).

Based on Dr. Miodovnik's testimony, a jury could find that he perceived the risk to Mrs. Abdul–Haqq to be significantly higher than disclosed in the DCBC Consent form that had been presented to her early in the pregnancy.[11]

The MOU between WHC and the DCBC recognizes that in certain circumstances, the nurse-midwives have a subordinated role, stating that they agree to "work in collaboration and/or *under medical direction when complications arise.*" (Emphasis added.) That was precisely the situation in this case. Nurse–Midwife Alexander testified that she orally presented Mrs. Abdul–Haqq's medical history, including that she had two prior caesarean sections and no prior vaginal delivery. She then asked Dr. Miodovnik "for an assessment and plan" for Mrs. Abdul–Haqq, who wanted to have a vaginal birth. As an obstetrician, Dr. Miodovnik knew that, under published standards, a VBAC such as was proposed for Mrs. Abdul–Haqq "should not be attempted." *ACOG Practice Bulletin No. 54*, at 5.[12] Reflecting his awareness of this standard and of his supervisory role with respect to a patient whose history raised a risk of serious "complications," in his deposition Dr. Miodovnik stated that "it was strongly *recommended to the midwife that the patient will have [a] repeat caesarean section.*" It is a disputed fact, however, whether he did so.[13] Nurse–Midwife Alexander testified at deposition that had Dr. Miodovnik told her "in no uncertain terms that [Mrs. Abdul–Haqq] was not a candidate for a

---

11. According to Dr. Miodovnik, the incidence of uterine rupture during a VBAC for women who had two caesarean sections can be as much as five times higher (up to 3.5%) than for women who have had one prior caesarean section, which is consistent with the ACOG standard. *See ACOG Practice Bulletin No. 54*, at 2. The DCBC consent form, see *infra* note 15, quantified the risk of uterine rupture at "0.5% to 1.0%" in "low risk" women with the possibility of resulting serious injury to the baby at "0.05% to 0.1%." and said that the risk "increased"—but without saying how much—for women who had more than one prior caesarean section.

12. It is undisputed that a VBAC is contraindicated, and that serious complications can arise, particularly for someone like Mrs. Abdul–Haqq who has had two previous caesarean deliveries and no prior vaginal delivery. In his deposition, Dr. Miodovnik conceded that a VBAC under these circumstances violated the standard of care in Mrs. Abdul–Haqq's case "[b]ecause it's clearly said, by ACOG, that if you have two caesarean sections without vaginal delivery, it is contraindicated of VBAC." *See ACOG Practice Bulletin No. 54*, at 2 ("[F]or women with 2 prior cesarean deliveries, only those with a prior vaginal delivery should be considered candidates for a spontaneous trial of labor."). Judge Thompson notes in her concurrence that Dr. Miodovnik was not testifying as an expert. But Dr. Miodovnik was not only qualified to express an opinion but, as a defendant in the case, also can be held to have admitted the point.

13. In his written "assessment and plan" for Mrs. Abdul–Haqq, noted in Dr. Miodovnik's own hand on her medical chart, Dr. Miodovnik did not mention that Mrs. Abdul–Haqq should have a repeat caesarean section, nor did he record the request he claims he made for Nurse–Midwife Alexander to impress on Mrs. Abdul–Haqq not only the serious risks of attempting labor and vaginal delivery, but also that it was medically recommended that she should have a caesarean section. Dr. Miodovnik wrote on Mrs. Abdul–Haqq's chart: "P [pregnancy] @ 35 3/7 weeks gestation. H/o [history of] c/s [caesarean section] × 2 [twice]. Pt. desires VBAC [vaginal birth after caesarean section]. Pt. understand [sic] that the risk of VBAC after two caesarean section [sic] is *much* higher for uterine rupture—fetal death and risk for her having increased mortality for herself. Needs—prophylactic antibiotics in labor." Nurse–Midwife Alexander testified that if Dr. Miodovnik had strongly recommended a caesarean section, she would have documented it in her note on the patient's chart. There was no such note.

VBAC and should get a C-section," "[w]e would have gone back to the client and spoken to her about his strong recommendation that she have a C-section, and given her that information as directly as possible and asked her to make the best decision for herself and her baby based on his recommendation." What Nurse–Midwife Alexander said she would have done (if Dr. Miodovnik had so advised her) is what DCBC's nurse-midwife expert, Carolyn Gregor, testified the standard of care required her to do. Dr. Miodovnik also testified that if a patient in Mrs. Abdul–Haqq's condition continued to object to a caesarean section, he "expected the midwife to refer [her] to us, either the high-risk clinic and to myself, for further discussion," and that either he or someone else in the high-risk clinic "could have persuaded [Mrs. Abdul–Haqq] to have a repeat caesarean section."[14] That did not happen, and Dr. Miodovnik testified that he did not follow-up. In short, the record contradicts the majority's assertion that Nurse–Midwife Alexander "was no less qualified than [Dr. Miodovnik] to speak with the patient and arrange for the [caesarean section]." See *ante* page 994. Unlike in *Newborn*, Dr. Miodovnik's testimony indicates his awareness that the nurse-midwives might not be capable of handling alone a complicated case such as the one presented by Mrs. Abdul–Haqq because of

the importance of explaining the medical risks. See *supra* note 5; *cf. Newborn*, 238 F.Supp.2d at 150 ("Dr. Merino stated . . . that she believed that [Dr. Devenport] could handle treatment of a patient experiencing sickle cell crisis."). Notwithstanding the degree of concern Dr. Miodovnik expressed in his pretrial deposition about the risk to Mrs. Abdul–Haqq posed by the planned vaginal delivery, and his concession that such a procedure violated the standard of care, the record supports that he acquiesced and recommended antibiotics for a proposed vaginal delivery that he knew to be contraindicated with, at best, a recommendation that the nurse-midwife (who had theretofore been unsuccessful) should "reiterate" the risks to the patient. *See Lownsbury*, 762 N.E.2d at 362 (finding that a physician may consent to a physician-patient relationship by taking certain actions, "such as examining, diagnosing, treating, or prescribing treatment for the patient").

It is undisputed that after the March 21st consultation with Dr. Miodovnik none of the nurse-midwives at DCBC impressed on Mrs. Abdul–Haqq that she was not a candidate for a vaginal delivery and urged her to have the caesarean section that, it is agreed, was the medically recommended course in her case.[15]

---

**14.** Dr. Miodovnik was asked whether he had "found, in your experience, in your practice, when you explain risks and benefits and chances of success, you have been able to persuade your patients to do the right thing when it comes to health care, correct?" Dr. Miodovnik answered, "Yes, I did."

**15.** Mrs. Abdul–Haqq testified that at an earlier point in her pregnancy someone she saw "once" at DCBC told her "that with a VBAC attempt, that there is a slight risk of uterine rupture." The record shows that in October 2004, approximately at the beginning of the second trimester of Mrs. Abdul–Haqq's pregnancy, she signed a DCBC form, "Consent for

Birth After Caesarean Section" that explained first the benefits, then the risks, of having a VBAC. That consent form provided some information of risks associated with VBAC, see *supra* note 11, but did not recommend a caesarean section after two prior caesarean sections and no prior vaginal delivery, as Dr. Miodovnik said was medically indicated. Nurse–Midwife Alexander corroborated that the risks and benefits of having a VBAC had been reviewed when Mrs. Abdul–Haqq signed the form, but that she did not subsequently discuss the risks of having a VBAC with Mrs. Abdul–Haqq.

## 2. Policy or Protocol for Consultation

Another significant element in the duty analysis is whether there was a "policy or protocol" requiring the consultation that did, in fact, occur. *Newborn*, 238 F.Supp.2d at 150. In *Newborn*, the German doctors who were the primary care physicians sometimes contacted various doctors at both German and U.S. military hospitals for general advice, but there was "no written or informal agreement for them to do so." *Id.* Unlike in *Newborn*, the consultation between Dr. Miodovnik and Nurse–Midwife Alexander, was not "informal," 238 F.Supp.2d at 149, but occurred in the course of an established ongoing contractual relationship between Dr. Miodovnik and DCBC. There are two written Memoranda of Understanding with DCBC, both signed by Dr. Miodovnik, who chairs the Department of Obstetrics and Gynecology at WHC. Under one of the agreements, Dr. Miodovnik is designated to serve as "Director of Medical Affairs" of the DCBC. The other agreement provides for "Ob/Gyn Consultation for Pregnancies and Well–Women for the [DCBC]."

The agreement for consulting services requires Dr. Miodovnik (or his designee) to "[p]rovide 24 hour consultation services to the nurse-midwives of the DCBC each day of the twelve months of the year." Specifically, the MOU provides that the DCBC would "[r]equest review and evaluation of specific client medical records," and "consult with the consulting obstetrician [Dr. Miodovnik or his designee] ... on any deviations from normal as outlined in the guidelines." Dr. Miodovnik correspondingly agreed to "[r]eview and evaluate specific client medical records," "[p]rovide ... consultation services to the nurse-midwives of the DCBC," and "[a]ccept the transfer and medical management or recommend transfer ... of any client who develops complications at any time." According to Nurse–Midwife Alexander, the DCBC nurse-midwives did not merely seek Dr. Miodovnik's casual opinion, but on a "routine" basis, at a given point in every DCBC's patient's pregnancy, they would "present the patient to him and then ask him for an assessment and plan on the patient." Dr. Miodovnik not only had a responsibility and practice to review the DCBC patients' medical charts when presented to him, but, as already discussed, he in fact reviewed and made notations in Mrs. Abdul–Haqq's chart and noted that she would need antibiotics for her proposed vaginal delivery. Dr. Miodovnik's formal contractual relationship with DCBC and his involvement in Mrs. Abdul–Haqq's treatment, as part of an established practice of regular consultation, support the existence of a legal duty. *See Corbet,* 980 S.W.2d at 169 ("Where the consultant physician does not physically examine or bill the patient, a physician-patient relationship can still arise where the physician is contractually obligated to provide assistance in the patient's diagnosis or treatment and does so.").[16] That is not to say

---

16. Even in jurisdictions that require a physician-patient relationship in order to give rise to a duty, courts have recognized that physicians can affirmatively consent to such a relationship by contract. *See Sterling,* 802 A.2d at 455 ("[I]n some circumstances a consultant may undertake by contract to take this 'affirmative' action, and by that accord be deemed to participate in the care and treatment of patients."). In a number of cases dealing with the duty of consulted "on call" physicians, courts have found the contractual obligation to be on call, and not the "on call" status itself, to be significant in finding a legal duty. *See Lownsbury,* 762 N.E.2d at 362 (noting that a "physician may consent to the relationship by explicitly contracting with the patient, treating hospital, or treating physician"); *Corbet,* 980 S.W.2d at 171 (finding the "on call" status of a physician who had not

that the contractual relationship alone gives rise to a duty between Dr. Miodovnik and all DCBC patients. However, when, as here, a consulting physician acts under a contract to consult with a primary care provider regarding a specific patient, and the consulting physician "take[s] . . . 'affirmative action' . . . to participate in the care and treatment of [a] patient[ ]," a duty will arise. *See Sterling*, 802 A.2d at 455; *cf. Oja*, 581 N.W.2d at 743 ("[C]onsent to a physician-patient relationship may be found only where a physician has done something, such as participate in the patient's diagnosis and treatment, that supports the implication that she consented to a physician-patient relationship.").

Having determined the legal question whether the defendant owed the plaintiff a duty, *see Settles*, 797 A.2d at 695, I agree that Dr. Miodovnik's responsibility may be limited to the discrete tasks assigned to him by the MOU.[17] *See In re Sealed Case*, 314 U.S.App. D.C. at 276, 67 F.3d at 970 (noting that the standard of care owed by a consulting physician extends "only to the careful performance of the duties outlined by the contractual agreement"). In affirming summary judgment on the basis that Dr. Miodovnik had "no duty to intervene," the majority relies on cases that acknowledged or assumed that the consulting doctors *did* have a duty to the patient, but only in "some circumstances." See *ante* page 990 & note 6. These cases do not support summary judgment in this case, however, because there the plaintiffs did not allege that the defendants were

negligent within those limited circumstances. *See id.*, 314 U.S.App. D.C. at 275, 67 F.3d at 969 ("Consultant had only the duty toward the Doctor, and arguably to [the patient], to use that level of skill expected of a part-time consultant whose discrete task is to review a particular set of test results ordered by the primary physician of a patient with whom the consultant has no independent relationship. [Plaintiff] does not allege that Consultant misread the six pages of results he reviewed, nor that he failed to inquire into or diagnose any underlying medical problem that he should have suspected based on those six pages."); *Dodd–Anderson v. Henderson*, No. 92–1015–MLB, 1997 WL 60743, at *3 (10th Cir Feb. 13, 1997) (unpublished) ("Even if Dr. Henderson incurred some duty when he responded to the call of the respiratory therapist, it was only a duty to inform Dr. Stevens of his impressions based on his limited knowledge of the patient. This he did.").

In this case, however, where appellants have claimed that Dr. Miodovnik was negligent in the performance of his duties under the contract in rendering consulting services to DCBC, it is for the jury to determine, after considering the contracts and hearing relevant expert testimony on the standard of care, whether Dr. Miodovnik's actions met the standard of "reasonable care" under the circumstances. Even so, the majority essentially rules that, notwithstanding the fact that expert testimony on the standard of care has not yet been developed, Dr. Miodovnik met what-

---

contracted to provide medical services to the patient, doctor, or hospital, insufficient to give rise to liability); *Fought v. Solce*, 821 S.W.2d 218, 220 (Tex.Ct.App.1991) ("[T]he fact that Solce volunteered to be 'on call' does not in itself impose a duty. Solce was under no contractual obligation with Eastway to be 'on call,' nor was he required to be 'on call' to maintain staff privileges.").

**17.** The trial court noted that Dr. Miodovnik agreed "to provide consultation . . . for the DCBC [and] review and evaluate specific client medical records at the request of the clinic and its midwives."

ever was required of him under the contract and pursuant to his responsibility as Medical Director of DCBC. That is a determination of the ultimate issue of liability, not whether a duty exists, and is premature.

### 3. The Lack of Compensation and Absence of Direct Physician–Patient Contact

The trial court was influenced by the fact that Dr. Miodovnik served as DCBC's Director of Medical Affairs without specific compensation, and that he consulted with the nurse-midwives, but did not meet, see, or speak directly with the patient, who was unaware of his involvement in her treatment plan. Courts have found that a physician may still incur a legal duty towards a patient "although his services are performed gratuitously." *See Wilson*, 894 So.2d at 634 (quoting *Wilson v. Teng*, 786 So.2d 485, 499 (Ala.2000)); *see also Cogswell*, 249 A.D.2d at 865, 672 N.Y.S.2d 460 (denying consulting physician's motion for summary judgment, despite the fact that he did not receive payment for his courtesy consultation). Moreover, it is important to bear in mind that Dr. Miodovnik's involvement was not that of a "good samaritan" or weekend *pro bono* volunteer. Rather, it is reasonable to assume that he undertook the considerable consulting responsibility to DCBC called for in the contract as part of his duties as Chair of WHC's Department of Obstetrics and Gynecology, to which DCBC patients were routinely referred.[18] Therefore, Dr. Miodovnik's position as DCBC's Medical Director and consulting physician provided at least an indirect financial benefit to his employer, WHC.[19] As an example, Mrs. Abdul–Haqq was charged by WHC for the obstetrical and related services rendered to her during childbirth. Further, the MOU expressly provides that Dr. Miodovnik is to "bill directly for the care provided" to DCBC patients who develop complications.

As already discussed, a traditional doctor-patient relationship is not necessarily a requirement for a legal duty to exist. Similarly, courts have acknowledged that a traditional doctor-patient relationship may exist even where the doctor has not had direct contact with the patient. *See Sterling*, 802 A.2d at 446–449 (citing cases), 455 ("In the final analysis, we take it as well-settled that a physician-patient relationship may arise by implication where the doctor takes affirmative action to participate in the care and treatment of a patient. An 'on-call' physician may be in the position to direct the care of a patient whom he has never seen, so that his or her instructions are followed, the results of which are manifest in the ensuing course of the patient's treatment.") When a contractual obligation exists, and there is actual consultation with respect to a particular patient, the lack of direct contact between the consulting physician and patient is not determinative. *See Corbet*, 980 S.W.2d at 169 ("Where the consultant physician does not physically examine or bill the patient, a physician-patient relationship can still arise where the physician is contractually obligated to provide assistance in the patient's diagnosis or treatment and does so.").

18. As noted, the agreement called for "24 hour consultation services to the nurse-midwives of the DCBC each day of the twelve months of the year."

19. Appellants' claims against WHC are based on *respondeat superior*. WHC did not move for summary judgment on the ground that Dr. Miodovnik's consulting services to DCBC were outside the scope of his responsibilities at the hospital.

Whether a consulting doctor is compensated and has direct contact with a patient may be relevant in elucidating the relationship between the consulting doctor and the primary health provider, whether the consultation is casual or formal, and whether it is expected that the consulted physician's advice will be followed. In this case, however, the lack of specific compensation to Dr. Miodovnik and the absence of direct patient contact say less about the relationship between Dr. Miodovnik and DCBC than do the express terms of the contract for consulting services and the testimony of Dr. Miodovnik and the nurse-midwives about the working relationship they had established and their actual consultation with respect to Mrs. Abdul–Haqq's treatment plan in particular.

## IV. Public Policy Considerations

### A. The Independence of the Licensed Nurse–Midwives

The trial court was influenced by the fact that, in the District of Columbia, nurse-midwives "are qualified to assume primary responsibility for the care of their patients," and may exercise "independent judgment" in patient management. *See* 17 DCMR § 5800.1 (2002). Similarly, the majority goes to great lengths to demonstrate that the "Council of the District of Columbia has recognized the independence of nurse-midwives," who "may perform actions of nursing diagnosis and nursing treatment of alterations of the health status," and "are qualified to assume primary responsibility for the care of their patients." See *ante* pages 989 (quoting D.C.Code § 3–1201.02(2) (2001); 17 DCMR § 5800.1 (2002)). Based on the nurse-midwives' professional status, the majority concludes that "[t]he nurse-midwives at the DCBC were independent practitioners fully qualified to act in these circumstances." See *ante* page 994.

The nurse-midwives' professional licensing and qualifications as well as their ability to practice independently within the scope of the activities permitted by their license are not in dispute. While relevant, however, they are not dispositive of whether Dr. Miodovnik owed a duty to the patient *on the facts of this case.* That this is so is made clear by the cases discussed above where the courts have considered whether a consulting doctor should be held to have a duty to the patient of a primary full-fledged *physician,* whose professional independence is similarly not in doubt. As already discussed, what is most relevant to the question of duty are Dr. Miodovnik's contractual obligation to DCBC, his established consulting relationship with the DCBC nurse-midwives, and his actual collaboration with the nurse-midwives in the care and supervision of Mrs. Abdul–Haqq's treatment during pregnancy in preparation for delivery. In this case, the record shows that even though licensed and legally authorized to act independently, the nurse-midwives did not retain complete control of Mrs. Abdul–Haqq's treatment and that they sought and followed Dr. Miodovnik's recommendations on her treatment plan as a matter of fact. To recognize that Dr. Miodovnik owed a duty to Mrs. Abdul–Haqq in the circumstances of this case in no way threatens the standing of the nurse-midwives who indisputably themselves also owed a duty of reasonable care to her. To conclude otherwise would base the duty analysis on a bare reading of what the licensing statute allows nurse-midwives to do, instead of on the facts of the particular case.

Similarly, I also do not think that there is reason for the trial court's expressed concern that if a duty were to be imposed on a consulting physician, "no specialist would undertake to advise a primary care

physician who is uncertain about how to deal with a crisis, regardless of how impartial or unofficial her professional relationship with the primary ca[r]e physician was and regardless of how infrequent or insubstantial the advice." (quoting *Newborn,* 238 F.Supp.2d at 150). The facts in this case, however, are that Dr. Miodovnik's consultation was neither informal nor insubstantial, but undertaken as part of his duties as the DCBC's Medical Director pursuant to a contractual obligation to provide consulting services, which he did on a regular basis. The analysis I have undertaken is consistent with the approach taken by the ACOG Committee on Ethics Opinion, *Seeking and Giving Consultation,* cited by *amici curiae* (American College of Nurse–Midwives and American Association of Birth Centers), which recognizes several levels of interaction between nurse-midwives and physicians in ascending order: from "professional dialogue" to three levels of "formal" consultation, which in turn range from a "single-visit consultation" to "continuing collaborative care" to "transfer of primary clinical responsibility."[20] ACOG Committee on Ethics, *ACOG Committee Opinion—Seeking and Giving Consultation,* No. 365, May 2007, at 1–2 [hereinafter ACOG Ethics Opinion]. Where in that spectrum the consultation at issue in this case falls is a subject for expert testimony, but there is evidence to suggest that the consultation had between Dr. Miodovnik and Nurse–Midwife Alexander was not, as *amici* suggest, at the least-involved end of the spectrum of "professional dialogue" which "does not constitute a formal consultation or establish a patient-consultant relationship." *See id.* at 1. According to the ACOG Ethics Opinion, "professional dialogue" occurs in situations where "clinicians share their opinions and knowl-

edge" and the consulted clinician is "asked a simple question and he or she does not talk with or examine the patient" and "does not make an entry in the patient's medical record." *Id.* Here, Dr. Miodovnik was not asked "a simple question" but asked for an "assessment and plan" for the patient, and he did make an entry on Mrs. Abdul–Haqq's medical chart.

*Amici* express a concern that to recognize the duty of a consulting physician to the patients of nurse-midwives would adversely affect access to quality care because it would "diminish the willingness of OBs to consult with midwives." Just as I do not question the professional independence and qualifications of nurse-midwives, I have no reason to doubt that they provide an important and welcome addition to the range of obstetrical and gynecological services available to women. But this argument goes too far, for it implicitly proposes that a special regime of legal liability should be devised to shield doctors who consult with nurse-midwives. As the majority notes, the legislature "has not spoken directly to the issues before us." See *ante* page 990. In a field as comprehensively defined and regulated as is the practice of nurse-midwifery in the District of Columbia, which we are told is "in the forefront in developing midwifery practice laws and regulations," it is particularly appropriate that any public policy-based exception to the usual rule of legal liability should come from the legislature and not be devised by the courts. An important part of any decision based on public policy would take into account that, according to *amici,* a high proportion (70%) of these patients are "considered vulnerable by virtue of their age, education, socioeconomic status, ethnicity or location of residence

---

**20.** The ACOG Ethics Opinion is not law, of course, and does not purport to define when a consulting physician owes a legal responsibili-

ty to the patient. But it is useful to consider its provisions in evaluating the level of Dr. Miodovnik's involvement.

.... [and that] over one-third of [certified nurse-midwife] clients reside in areas where a higher-than-average number of people are living below the poverty level." A legislative body could gather the information necessary and has the procedures to evaluate competing considerations in a field as fraught with trade-offs in the allocation of resources and costs as health care. I see no reason, however, why these patients should as a matter of law be entitled to less accountability from a consulting physician than a patient who is able to pay full fare to a physician who similarly consults with another physician.[21]

## B. The Autonomy of Pregnant Patients

Finally, it is important to weigh the argument made by *amici* that to impose a duty on a consulting physician such as Dr. Miodovnik and hold him responsible for providing proper medical advice compromises "the legal autonomy of pregnant women [who are] fully competent to assume whatever risks a particular type of delivery—vaginal, caesarean, VBAC—might entail." As the majority points out, neither Dr. Miodovnik nor the nurse-midwives could have forced Mrs. Abdul–Haqq to undergo a caesarean section if she did not want it. But we may not assume that comprehensive informed consent was obtained from Mrs. Abdul–Haqq in this case

simply because she signed the DCBC consent form early in her pregnancy. In essence, her claim is that she was not given proper medical advice, and therefore was not able to decide for herself on an informed basis. Mrs. Abdul–Haqq testified that she had understood the risk of uterine rupture was "slight," and Nurse–Midwife Alexander confirmed that after the VBAC consent form was signed early in the pregnancy there was no further discussion of the risks with her. The record bears that out, for when Dr. Leslie told Mrs. Abdul–Haqq at the hospital that a caesarean section was indicated in her case because of the risks posed by attempting a vaginal delivery in light of her medical history, Mrs. Abdul–Haqq readily agreed to a caesarean section after obtaining assurance from Dr. Leslie that her bladder would be protected from injury.[22] Such advice, had it been given timely, likely would have averted the tragedy in this case. A pregnant woman's legal autonomy to make her own decisions, including her right to assume a calculated risk, is only as good as the information she is provided about the risks attendant to the options available to her.

\* \* \*

As we have noted, whether a common law duty exists in a particular situation is,

---

21. As mentioned, Dr. Miodovnik testified that he is "good at persuading people" and that in his practice he had been successful in persuading patients to "do the right thing when it comes to health care." However, the evidence permits an inference that he did not do so in the case of a DCBC patient.

22. When Mrs. Abdul–Haqq went to WHC in labor, DCBC Nurse–Midwife Rothman notified the on-call WHC physician, Dr. Virginia Leslie. After learning of Mrs. Abdul–Haqq's medical history of two prior caesarean sections, Dr. Leslie immediately became concerned and personally counseled Mrs. Abdul–Haqq against a vaginal birth and recom-

mended that she undergo a third caesarean section. Mrs. Abdul–Haqq testified that she asked a question and once she was assured that her bladder would be protected, she agreed to the operation because she knew, having "been through it before," that a caesarean section is "safe." Judge Thompson might be correct that Mrs. Abdul–Haqq's willingness to change course "says more about the pain and anxiety attendant to labor than about the adequacy or inadequacy of previous warnings and advice." But that is a question of fact for the jury that goes to proximate causation and is not for the court to decide.

*See Bd. Of Trustees of the Univ. of the District of Columbia v. DiSalvo,* 974 A.2d 868, 871 n. 2 (D.C.2009) ("The existence of a duty is also shaped by considerations of fairness and 'results ultimately from policy decisions made by the courts and the legislatures.'" (quoting *Williams,* 572 A.2d at 1064)). In this case policy grounded on legal principles favors a determination that Dr. Miodovnik had a legal duty to Mrs. Abdul–Haqq, and public policy considerations also support it.[23] To hold otherwise on the facts presented here, where there was both a contractual obligation and a practice of regular consultation with a doctor who had superior knowledge and experience in the matter consulted, and where the doctor actually consulted with respect to a particular patient, would imply that under District of Columbia law there is no duty for a consulting physician to render appropriate advice simply because the patient is primarily being treated by another primary care giver.

For all the foregoing reasons, I would reverse the grant of summary judgment and, having recognized that a legal duty was owed, remand the case for further proceedings.

---

**23.** Indeed, it is ironic that if we were to analyze Mrs. Abdul–Haqq's claim as one for negligent infliction of emotional distress resulting from Dr. Miodovnik's negligence toward DCBC, she would be able to press her claim because the alleged negligence placed her in a "zone of physical danger." *See Williams,* 572 A.2d at 1073 ("We adopt the zone of danger rule which allows recovery for mental distress as long as the plaintiff was in the zone of physical danger and as a result feared for his or her own safety because of defendant's negligence."). In *Williams,* we found that the plaintiff mother could not re-

cover damages for the negligent infliction of emotional distress because she was not placed in physical danger as a result of a physician's negligence in providing medical treatment to her son. *Id.* at 1073. Mrs. Abdul–Haqq in fact was physically injured, however, and the damages she is claiming are primarily economic in nature, related to the physical injuries that she and her son suffered. Moreover, any mental distress claim would appear well-grounded in light of the severity of the physical injuries and the continuing challenges of caring for a disabled child.